**ALONZO B. HAYDEN, Inc., v. TOWN OF COVINGTON.**

District Court, E. D. Louisiana, New Orleans Division.   March 15, 1926.

No. 17695.

1. Evidence ⬚83(2)—Contractor having cemented joints in water without objection of supervising engineer, his and town's consent must be presumed, discharging contractor of liability.

Where contractor, constructing sewer system, cemented joints in water in several instances, and supervising engineer made no objection, engineer's consent and that of town, his employer, must be presumed, and contractor discharged of liability, even if such defective joints caused breaks in line.

2. Municipal corporations ⬚364—Town was responsible for any negligence or incapacity of supervising engineer, causing breaks in sewer, relieving contractor, suing for balance due, of liability.

Under contract for construction of sewer, compelling complete surrender of discretion by contractor to supervising engineer, town was responsible for any negligence or incapacity of its supervising engineer, resulting in breaks in line, so that contractor, suing for balance due under contract, was relieved of responsibility.

3. Liens ⬚7—Contractor held entitled to equitable lien, for balance due under contract, on proceeds of bonds sold for construction of sewer system.

Although none but statutory liens were recognized in state, contractor held entitled in federal court of equity, sitting as such in state, to equitable lien, for balance due under contract, on proceeds of bonds sold for construction of sewer system.

4. Equity ⬚39(1)—In equity, all issues must be finally disposed of.

In court of equity, all issues must be finally disposed of.

5. Municipal corporations ⬚374(1)—In suit for balance due for constructing sewer system, contractor cannot recover for repair work done to avoid controversy, where some work was defective.

In suit by contractor to restrain town from paying out proceeds of sale of bonds, and for recognition of its lien for balance due under contract for constructing sewer, and for money judgment, held, contractor held not entitled to payment for repairing certain spots in line voluntarily assumed by him as duty under contract to avoid controversy, without specific supplemental agreement therefor, where workmanship was shown to be defective in some of pipe joints, and in variation of several inches from true line.

6. Municipal corporations ⬚374(1)—Contractor, suing for balance due, cannot recover payments of salary and bond premiums to town's engineers, growing out of extensions of time granted contractor during period of voluntary reconstruction of parts of sewer.

In suit by contractor for lien on proceeds of bonds for balance due under contract for construction of sewer system and for money judgment, contractor held not entitled to claim for payments of salary and bond premiums to town's engineers, growing out of extensions of time granted contractor by town, during which voluntary reconstruction of parts of sewer was made, in order to avoid controversy.

7. Municipal corporations ⬚375—Town could not recover from contractor cost of reconstructing parts of sewer, constructed according to supervising engineer's directions.

In suit by contractor for lien on proceeds of bonds for balance due and for money judgment, town, filing cross-bill, could not recover cost of reconstructing parts of sewer constructed according to directions of supervising engineers, under contract compelling complete surrender of discretion by contractor, since, if defects were caused by negligence and incapacity of engineers town was responsible, and, if defects were caused by joints cemented in water without objection from engineer, contractor was discharged of liability.

In Equity. Suit by Alonzo B. Hayden, Inc., against the Town of Covington, in which defendant filed counterclaim against plaintiff and its surety, the Fidelity & Deposit Company of Maryland. Decree for plaintiff and its surety, in accordance with opinion.

Decree affirmed in 27 F.(2d) 360.

Harvey E. Ellis, of Covington, La., and Denegre, Leovy & Chaffe and Milner & Porteous, all of New Orleans, La., for Fidelity & Deposit Co.

B. M. Miller, of Covington, La., for town of Covington.

B. M. Miller, of Covington, La., and J. Zach Spearing, of New Orleans, La., for Chambers & Bowers.

BURNS, District Judge. Plaintiff, contractor, a citizen of Mississippi, sues to restrain the town of Covington, St. Tammany parish, La., from paying out certain proceeds of a sale of bonds, and for recognition of its lien thereon up to the amount of its claim for a balance due and a retained percentage under its contract for the construction of a sewer system in said town. A money judgment is also prayed for, which is itemized as follows:

1. 15 per cent. of the amount due plaintiff for work done and material furnished, under estimate furnished by the Kramer Engineering Company, by the Town of Covington, under division No. 10—total .................. $ 6,579.92
2. Amount retained by the town of Covington out of amount due plaintiff for the completion of the pump pit, division No. 11—total ...................... 730.88
3. Balance due on 6 manholes, $5 each, which should have been placed in estimate 18, which was never issued by the Kramer Engineering Company—total...... 30.00
4. Amount retained by the town of Covington, being balance due on contract price, exclusive of the 15 per cent. retained on estimate on division No. 10—total 7,500.00
5. Actual expense and damage sustained on account of being called upon by the Kramer Engineering Company, the agents of the town of Covington, to make repairs in the outfall line, the responsibility of the repairs being indeterminable until the work had been practically completed, the agents of the town taking the position that the break in said outfall line was due to the fault of your petitioner, which was found not to be true, all of which will more fully appear by reference to the detailed and itemized statement hereto annexed and made part hereof, marked for identification as Plaintiff's Exhibit C—total.... 6,704.99
6. Amount paid to Rudolph Schultz, resident engineer of the town of Covington, by petitioner from September 1, 1923, to May 1, 1924, at $150 per month, which was not contemplated in the contract—total .............. 1,200.00
7. Amount of premium paid on bond of the Kramer Engineering Company in favor of the town of Covington, not included in contract—total ................. 150.00
   
   Grand total................ $22,895.79

The town's answer is that the printed contract is the best evidence of its terms; that the town supplied double strength pipe, and not single strength, as alleged by plaintiff. It denies generally the allegations of the plaintiff, to the effect that the work was done in workmanlike manner, according to specifications, under the supervision of the Kramer Engineering Company. The answer alleges, in detail, a number of defects in workmanship. It alleges that an individual engineer, Xavier A. Kramer, and not the Kramer Engineering Company, was under contract to supervise the work for it; that after the plaintiff contractor had abandoned the work, and after notice to it and its surety, Xavier A. Kramer was discharged as engineer, and one J. L. Porter, an engineer of New Orleans, was employed in his stead; that, if the line had been properly constructed under the original specifications, these would have been sufficient for the purpose; but, "in order to avoid the possibility of a break in said outfall line, the specifications for the construction of same under the supervision of J. L. Porter, were changed in some respects," but the pipe used in the reconstruction was the same as that used previously by plaintiff. Further, the town admits making a new contract with Chambers & Bowers "for the completion of said sewer system for the sum of $19,000, and Porter, as engineer, supervised the work. It denies that plaintiff has an equitable lien on the proceeds of the bond sale, or that any except statutory liens can be recognized in Louisiana. Then, by way of counterclaim or cross-bill, it prays for judgment against the contractor and its surety in the sum of $30,407.40, which is itemized as follows:

To Chambers & Bowers, for reconstructing the line............... $19,500.00
To John L. Porter, engineer, for services and for supervising same 1,148.36
To Chambers & Bowers, for repairing other breaks................ 2,276.31
To Southern Sewer & Pipe Works for new pipe to replace pipe broken, and unfit for reconstruction, for freight thereon.............. 450.00
To James Murphy, and L. R. Lester, engineers, for supervising other reconstructions, "other than outfall line" ......................... 500.00
For other expenses............... 736.64
For other costs to be proven at trial 5,000.00

Total ....................... $30,407.50

These last three items, alleged in detail in the cross-bill, relate principally to manholes and constructions in other sections of the town, beyond the outfall line.

The Fidelity & Deposit Company of Maryland, surety, filed an answer, tracking

that of the plaintiff, its principal, and a special plea to the effect that, as surety, it was discharged of all liability for the reconstruction of the outfall line, by the changes made in the Porter specifications, and the failure of the town to obtain its consent, as surety, to such changes.

A restraining order issued on the bill. A motion to dismiss was denied, and an injunction pendente lite granted on May 25, 1925. Issue being joined, the cause came on to be heard in open court, being finally submitted on the merits February 10, 1926.

By popular election, in May, 1922, the town voted a bond issue of $50,000 to provide funds for the purpose of constructing a sewerage system, and borrowed $25,000 additional in November, 1923, to complete same. The Kramer Engineering Company prepared plans and specifications, and were employed and authorized by the town to supervise the construction.

Alonzo B. Hayden, Inc., plaintiff, was awarded a contract for the sewer line and its structures, complete. Under division 10 of the contract he was to furnish all labor and material (except vitrified sewer pipe, which item was to be furnished by the town) for $48,975.69. Under division No. 11, for two pumping units, constructing pump pit, and laying approximately 380 feet of six-inch pressure line complete, as per plans, he was to receive $4,500. The contract was signed November 23, 1922, but it was understood the work was to begin January 1, 1923.

Division No. 10, which involves the main controversy, required the laying of a 15-inch sewer pipe from the intersection of Jahncke avenue and Thompson street, and along this street to Tchefuncta river, a distance of some 10 city blocks, which was known as the outfall line, the deepest cut in which being between Second and Fifth avenues, where it was 15 to 18 feet deep. The work was completed in about seven months, and the cuts filled in to city street grade, when depressions began to appear on the ground surface, along the deep cuts, which indicated that the sewer line had sagged or given way below.

The town's supervising engineers insisted that there was a buckle in the pipe, and called on the contractor to repair and reconstruct. The contractor, insisting that the work had been done according to specifications, but "in order to avoid controversy," exhumed the pipe in eight or nine such spots and replaced it. Meanwhile, other such depressions appeared, whereupon the contractor refused to repair or reconstruct any more, unless paid extra therefor.

The town, after notice to the contractor and the surety on its bond, then contracted for the reconstruction with Chambers & Bowers, contractors, a partnership composed of John Chambers and Norman E. Bowers, both citizens of Louisiana. This partnership has been made party by a supplemental bill, praying that they be restrained from receiving payment from the town out of the special fund.

The bill alleges that the fault was entirely with the town; that the specifications, as to both material and work furnished by the contractor, were meticulously complied with; that the work was done in exact accordance with the instructions and detail orders of the supervising engineers, who had a resident engineer in constant charge of the work, as required by the terms of the contract; that in every instance where a break occurred it was found, when the damaged part was uncovered, that there was no fault in workmanship or material furnished by the contractor; that in the eight or nine such breaks repaired, according to its information and belief, the breaks occurred because the town furnished standard or single strength pipe, which was not of sufficient tensile strength to withstand the pressure resulting from such a heavy fill, although all pipe, before being placed in the fill, had been inspected and field tested by the supervising engineer.

Stripped of irrelevancies, the credible evidence is that, although Alonzo B. Hayden Company, Incorporated, of Pass Christian, Miss., was engaged principally in a general plumbing business, and had no previous experience in constructing sewer systems, it made no misrepresentations upon this point; that it was competent to undertake such work in good faith; that it did employ a competent graduate engineer, a competent foreman, and workmen skilled in that class of work; that the town delegated its authority to supervise the work to Kramer Engineering Company, or Xavier Kramer, of Magnolia, Miss., who, in turn, delegated it to one William E. Holmes, of Indianola, Miss., designated as a chief engineer, who, though he made "inspection trips at least twice a month," delegated the actual supervision to one C. N. Schultz, of Covington, La., who is designated as resident "engineer." Schultz testifies that "he was not a graduate engineer," but "for eleven years I have been doing construction work, practicing engineering on highway, street work, and municipal work, sewerage and water." This was his first sewer job.

The subterranean condition was made dif-

ficult in spots by springs of water and quick-sand, and this was augmented by an unusually heavy rainfall during the period of operation, which was sought to be overcome by pumping, using sheet piling and sand bag dams to keep water from the pipe joints as they were being placed, caulked, and cemented.

The town council urged the contractor, through its engineer, to hurry the work to completion, because the streets and sidewalks were made difficult of passage by such operations in the prevailing weather. There may have been, and probably were, some imperfect joints made; but this does not sufficiently and satisfactorily appear to justify a finding that the work generally was imperfectly done. Schultz, the town's supervising engineer, was there continuously, and says that some, probably three or four, joints were laid in water, and these may have been defective.

There is testimony of engineers of acknowledged ability in such work, who were engaged by the town to give opinions as to the sufficiency of the specifications as to the workmanship of the contractor, as evidenced by exhumed pipe. Their opinion is to the effect that in some of the pipe too much cement was used in the lower half of the bells, which prevented a proper entry of the spigot end of the next piece, thereby making an improper joint, and also that some of the joints showed evidence of having been made in water, which prevented a perfect setting of cement. Much of this opinion evidence was predicated on what these experts heard in the courtroom, and is not very convincing in the face of the detailed reports furnished by the contractor, showing a check of the condition of all pipes removed by Chambers & Bowers, and the testimony of the superintendent of that firm, by whom the work was reconstructed. On the contrary, it appears by a fair preponderance of evidence that the trouble was due to the failure of the town, through its engineers, to cause a suitable foundation to be placed on the infirm bottom soil where springs and quicksand abounded, as it should have done and as contemplated in advance by the specifications; that the pipes were properly laid, lined up, caulked, jointed, and backfilled with earth, according to specifications, under the supervision and direction of Schultz, the town's local supervising "engineer," who issued certificates for all payments due the contractor as the work progressed, without exception, until the whole line was laid. Any imperfect joints that may have contributed to the breaking

down of the system were due, primarily, to his failure to inspect, discover, and to reject same at the time of discovery. It is impossible to determine how far minor derelictions, on the part of the contractor, contributed to the resulting damage in the few imperfect joints and in the slight variations of an inch or two occasionally appearing in the line.

The controversy over the tensile strength of the pipe, as to whether it was single or double strength, is a hypothetical issue arising from preliminary theories of the lawyers in the case, which, upon the hearing, was found unjustified by the credible evidence. Nearly all pipes exhumed were in good condition, except such as were broken in the course of removal. Moreover, all pipe was furnished by the town, and not by the contractor, and therefore the town, and not the contractor, is responsible for the quality of pipe selected by it.

The evidence shows that the line gave way primarily because it was not supported by a suitable stable foundation in the bottom of the trench, in places where the shifting soil and water springs scoured the bottom and circumjacent soil or sand after the pipe was laid and while the soil was in an unsettled condition, impinging thereby the weight of the settling backfill on the pipe line from above, and causing the opening of joints. This, in turn, augmented the process of destruction by draining the fluid mass into the outfall line, so that each succeeding break assured another at the next unsteady spot beyond, either above or below it, or both.

Schultz's testimony is that it was he who prepared the data for the monthly certificates upon which the contractor was paid, and in doing so he had no complaint to make about the work. He admits that he did not go down into the trench to see if the joints were cemented. He had worked variously for the state highway commission in St. Tammany parish, and on public road and levee construction during the past 11 years. Ultimately the town, through its town council, depended on this agent and employee, as a substitute for an engineer, for the technical supervision of an important work under a contract the very terms of which imposed on the contractor absolute obedience to his judgment and a complete surrender to him of all discretion as to time and details in the method of execution of the work.

[1] Schultz admits that in several instances joints were cemented in water, and he made no objection, so that, if the several defective joints that may have resulted from this could be considered as the cause of all the breaks

in the line, his consent to such procedure, and therefore that of the town, would have to be presumed and the contractor discharged of. liability. See Blodgett v. Cheney, 129 La. 1057, 57 So. 369; Andrews v. Jacobs, 4 La. 101; Mahoney v. Church, 47 La. Ann. 1064, 17 So. 484; Concrete Construction & Contracting Co. v. Lewis, 7 Orleans App. 397, 398.

[2] It is important to note that the cost of such foundation as might have been laid, at the option of the town, on the insecure portions of the trench bottom, would have been sustained by the town and paid for as extra work under the specifications, because the failure to require same, particularly after the advisability of it had been discussed between the contractor and Schultz and Holmes on several occasions, suggests very strongly that either false economy was deliberately practiced on the part of the town, or, if not, that the omission was due to the negligence and incapacity of its supervising engineers, for whose acts it is responsible under a contract cast in such terms as compel a complete surrender of discretion by the contractor, the more pertinent of which are as follows:

"The trench shall be at least one foot wider at the base than the outside diameter of the sewer pipe, and the side of the trench shall be at least six inches from the nearest part of the pipe. The sides of the trench shall be approximately perpendicular. The bottom of the trench shall be trimmed to conform to the outside of the pipes and dished out to receive the bell of the pipes and allow an even bearing along its entire length.

"Where the bottom of the trench does not, in the opinion of the engineers, make a suitable foundation for the sewer, the trench shall be deepened and a new foundation of such material as the engineers may require shall be put in as directed by them. The contractor shall receive for this extra foundation the price bid per 1,000 feet B. M. if foundation is of lumber, on the price bid per cubic yard for concrete masonry if the foundation is concrete, and for additional excavation as is made necessary by reason of such foundations; he shall also receive the price per cubic yard for such additional excavations as is estimated by the engineers."

"The contractor shall keep the trenches free from water during the construction of the work, and shall prevent water from flowing through the sewer until given permission by the engineer. Whenever, in the opinion of the engineers, it is necessary to close-sheet the trench in order to lay the sewer or its appurtenances, properly, the contractor shall so sheet the trench at his own expense; but, where sheeting is left in by order of the engineers, he shall receive therefor the price per 1,000 feet B. M. for such lumber as is left in the trench by order of the engineers."

"Previous to laying the pipe and specials which have been delivered upon the line of the work they shall be subject to rigid inspection, and those which do not meet the foregoing requirements shall be rejected. Inspection of pipe by engineers, however, will not release contractor from responsibility for damaged pipe found in line upon final inspection."

"If required by the engineers, each piece of pipe must be fitted into the socket it is intended to enter before lowering into trench, and the top of each piece shall be plainly marked point is to be placed uppermost in the sewer."

"The pipe shall be so laid in the trench that, when the sewer is completed, the bottom interior surface or invert thereof shall conform accurately to the grades and alignment given by the engineers. While the pipes are being laid between adjoining manholes in each straight division of the sewer, light from the remote end shall remain constantly in plain view and shall show the true cross-section of the sewer. Before final acceptance the sewer must be found to conform accurately to said alignment and grade, and to be free from obstruction and deposit.

"The joints between the individual pipes shall, in all cases, be made as nearly watertight as possible. A bed of cement mortar shall be applied to the lower half of the bell in the usual manner, after which the next pipe shall be carefully introduced. The annular space shall be partly filled with cement mortar, after which a gasket of oakum shall be inserted between the bell and spigot, and thoroughly caulked. The gasket shall be one continuous piece for each joint, and of such thickness as to bring and maintain the inverts of the top pipe smooth and even. The remainder of the joint will then be filled with cement mortar. Special care to perfectly fill the annular space at the bottom and sides, as well as the top, with mortar, must be taken. After such space has been filled as described, an even and proper finish shall be given to the joint by the further application of similar mortar to the face of the hub or socket as to form a continuous and evenly beveled surface from the exterior of said socket to the exterior of connecting spigot all around. The engineer may designate changes in the above method, if he deems advisable.

"While pipe laying is in progress, and after each joint is made as herein described, the contractor shall keep the trench clear of water until the cement has properly set. In no case shall the water be allowed to rise in the trench to reach the cement before it has hardened to the satisfaction of the engineers. When required by the engineers, the joint, when completed, shall be properly wrapped with unbleached cotton or cheese cloth. The surplus mortar which may find entrance to the pipe when making the joint shall be removed by a suitable scraper. In pipes 12 inches or under in diameter, a firm stiff swab filling the entire bore of the pipe shall be used by being drawn forward as the work progresses. The swab shall be removed every fourth joint to be properly cleaned and to provide for the removal of any cement that may have accumulated. When pipe laying is completed for the day, the swab shall be removed. Suitable filling for the swab shall always be kept on the work.

"As soon as the cement of the pipe joints has properly hardened, the refilling of the trench shall be commenced. The best available material saved from the excavations shall be used, properly compacted to give the pipe a solid and uniform bed of one-half its perimeter, and the utmost care must be taken not to disturb the pipes, by stepping on or near them, or by throwing earth on them from the bank above or raising a pipe from its proper position by careless or unskillful ramming around it, or by unequal filling on the sides. Equal and similar care shall be exercised in filling up to six inches above the top of the sewer. In filling around the sewer, the engineers will direct or approve the kind of compacting tools used, and the exact method to be followed in each case, and the contractor shall provide such tools, and follow instructions. The remainder of the lower portion of the trench shall then be filled with earth, firmly compacted with proper tools until a depth of at least two feet above the top of the pipe has been obtained. The earth, carefully selected, must not be thrown from above faster than the workmen below can distribute it and compact it.

"The refilling of the trench above the aforesaid level of two feet above the pipe shall be by ramming, puddling, or floating, as the engineers may direct. In case of ramming, the earth shall be deposited in layers, not exceeding one foot in thickness, each of which shall be thoroughly compacted, there not being less than one man ramming to each two shoveling. In case of puddling or flooding, it shall be done in such manner as directed by the engineers."

[3] By an interlocutory decree herein, dated May 25, 1925, Judge Foster held that, although there are none but statutory liens recognized in the state of Louisiana, a federal court of equity, sitting as such in the state, has authority to grant equitable relief in a case such as this, and I can find no just reason for modifying or changing that ruling. Accordingly the plaintiff's right will be recognized as against the special fund, and the town enjoined from paying out the same, except after payment therefrom, by priority, to the plaintiff of such sums as may be found due by final decree herein.

[4, 5] Since, in a court of equity, all issues must be finally disposed of, I find that the plaintiff is entitled to payment by the defendant town of the items 1, 2, 3, and 4, as first hereinabove set forth; that he is not entitled to payment for the items 5, 6, and 7 set out therein. As to item 5, the expense of repairing certain spots in the outfall line was voluntarily assumed by him as a duty under the contract, "in order to avoid a controversy," and without a specific supplemental agreement therefor. Any contention that the general finding of fact herein in favor of the plaintiff should sustain a conclusion that he should be paid this item is overcome by the specific finding that, to some extent, the workmanship was shown to be deficient in some of the pipe joints, and in a variation of several inches from a true line, and therefore the town is equitably entitled to the rejection of this item.

[6] Items 6 and 7, for the payments of salary and bond premiums to the town's engineers, are in a similar case. These grew out of the extensions of time granted the contractor by the town, during which the voluntary reconstruction described in item 5 was made, and were assumed voluntarily by the contractor, so that the three items are really parts of the one transaction.

[7] The reconventional demand or cross-bill of the defendant town against the plaintiff and its surety will be rejected. Items 1 and 2, for reconstructing the line and the services of the engineer, Porter, cannot be sustained under the general finding made. The remaining five items, for repairs and incidental expenses, to the extent that these are not covered by the general finding of facts, are not sufficiently sustained by competent evidence to justify a decree in favor of the defendant.

Under the circumstances, the contentions

made on behalf of the Fidelity & Deposit Company of Maryland, as surety, to the effect that the original specifications were changed when the contract for reconstruction was given Chambers & Bowers, need not be analyzed or specially considered, since the decree is in favor of its principal.

A decree may be drawn accordingly, in favor of the plaintiff and its surety, granting the necessary writ of injunction, and otherwise in conformity herewith. Costs to follow decree.