O’NIELL, C. J.
 

 The title of this case looks as if somebody had pied the type. But it is not so. Bing Dampskibsaktieselskab is the name of a steamship corporation in the kingdom of Norway.
 

 The suit is a result of an undertaking on the part of the plaintiff to build four wooden ships for the steamship company during the late war. The contract was made, originally, between the Slidell' Dry Dock & Shipbuilding Company, as builder, and the Coast Steamship Company, for whom the ships were to be built. The plaintiff, Louisiana Shipbuilding Company, succeeded to the rights and obligations of the Slidell Dry Dock & Shipbuilding Company; and the defendant, Bing Dampskibsaktieselskab, bought and took over the Coast Steamship Company’s part in the contract. For convenience, however, we will refer to the plaintiff and the defendant as if they were the original makers of the contract, calling them, respectively the builder and the steamship company.
 

 The contract was for the building of two ships according to plans and specifications that were furnished by the steamship company and attached to and made part of the contract; but the steamship company had the option of ordering, within 90 days, two more ships to be built under the same terms and conditions/ The steamship company availed itself of the option by ordering, within the 90 days, two more ships to be built on the same plans and specifications, but 20 feet longer than the first two ships. The first two ships were designated in the contract by the construction numbers D-l and D^-2, and the last two ships were known as D-3 and D-4.
 

 The steamship company was to supply and deliver at the shipyard, at the company’s expense, the engines and machinery, and all materials to be used in the construction of the ships, except lumber. The builder was to supply the lumber, for account of the steamship company, at prices stipulated in the contract. The consideration which the builder was to receive was the actual cost of all direct labor on the ships, plus 25 peícent. of such actual cost, the total not to exceed $38,550 for each ship.
 

 Immediately following the stipulation in the contract, the ships to be “built to the plans and specifications hereto annexed, which are hereby made a part of this contract,” was this important paragraph, viz.:
 

 “The said vessels shall be constructed according to the requirements of American record to class A No. 1 for ocean-going vessels, and further shall be constructed and equipped
 
 *551
 
 in accordance with the requirements of the United States Steamboat Inspection Laws in force on date of contract.”
 

 The ships did not class A No. 1 for oceangoing vessels, according to the requirements of the American Bureau of Shipping, and the question is whether the builder or the steamship company is responsible for the failure.
 

 After the vessels D-l and D-2 were built, and while D-3 and D-Hl were being built, the American Bureau of Shipping disapproved the construction of D-l and D-2. The steamship company thereupon ordered the builder to stop work on the ships D-3 and D-4, and afterwards prepared and sent new plans and specifications, approved by . the American Bureau of Shipping, under which new plans and specifications the ships D-3 and D-4 were completed. The result of the interruption and change of plans and specifications was that D-3 remained on the ways 30 days overtime, and D-4 remained 138 days overtime, for which the builder has brought this suit, for $21,000, claiming $125 per day per ship for the use of the ways. Plaintiff also claimed an additional overhead charge of $6,728.08, being 50 per cent, of the additional cost of labor required by the change in construction of the vessels I>-3 and D^4, but that claim has been abandoned.
 

 The defendant has set up a reconventional demand for $644,528.70, viz., for extra labor on the four ships at plaintiff’s shipyard, over and above the limit of $38,550 per ship, $173,-225.43; for extra labor on ships D-3 and D-4, after they left plaintiff’s shipyard, $30,-587.03 ; for an extra charge made by plaintiff and paid by defendant for additional lumber required by the change in the plans and specifications for the ships D-3 and D-4, being $10 per M foot on an additional 552,-435 feet of lumber, $5,524.35; demurrage, at $50 per day per ship (as stipulated in the contract), $38,400; and the cost of strengthening the ships to comply with the requirements of the American Bureau of Shipping, after the ships had left plaintiff’s shipyard, for D-l, $201,971.31, for D-2, $118,944, and for D-3 and D-4, $75,876.58.
 

 The district court rejected the plaintiff’s demand and the defendant’s reconventional demand. Both parties have appealed.
 

 Our opinion is that the judgment appealed from is correct. There was no provision in the contract — either express or implied — that the builder should have extra compensation for the use of the ways, if, for any reason, the construction of the ships should require more time than the parties contemplated.1 On the other hand, to hold the plaintiff liable on the defendant’s reconventional demand would be to say that the plaintiff was responsible for the failure of the ships to come up to the requirements of the American Bureau of Shipping, to class A No. 1 for ocean-going vessels. The contract did not make the builder a warrantor in that respect. The plans and specifications . on which the builder was required to construct the ships, as we have said, were made and furnished by the steamship company, and they were approved by the chief inspector of the American Bureau of Shipping. The steamship company had a competent representative at the shipyard always, making the detail plans and drawings that were needed as the work progressed, and inspecting and approving the work. His detail drawings of the major members of the vessels were sent to the New York office of the American Bureau of Shipping for approval, and were there approved in every instance, and the detail drawings of the minor members were submitted to the local surveyor for the bureau, in New Orleans, who had authority to approve and did approve the drawings. The local inspector wont from New Orleans to the shipyard and inspected and approved the work on the ships twice every month. The disapproval of the construction of the ships
 
 *553
 
 D-l and D-2 by the officials of the American Bureau of Shipping came when the chief inspector who had approved the plans and specifications went out of office, and when the local inspector, in New Orleans, who had inspected and approved the work on the ships as it progressed, was succeeded in office by another inspector.
 

 Both parties to the contract believed that the ships, when completed, would be approved by the American Bureau of Shipping, to class A No. 1 for ocean-going vessels, if built according to the plans and specifications that had been approved by the bureau’s chief inspector, and especially when built under the direct observation and inspection of the bureau’s local inspector. The builder had no right to deviate from the plans or specifications that had been furnished by the steamship company or to deviate from the working plans or instructions that were given by the steamship company’s draftsman as the work progressed. The double requirement in the contract that the ships should be built to the plans and specifications annexed to the contract, and that they should “be constructed according- to the requirements of American record to class A No. 1 for ocean-going vessels,” did not make the builder a warrantor that the ships, when completed, would be classed A No. 1 by the American Bureau of Shipping. It would have been so perhaps if the builder had furnished the plans and specifications, representing them as for a ship to class A No. 1 for ocean-going vessels. But, inasmuch as the steamship company, for whom the ships were to be built, furnished the plans and specifications, the case is controlled by the doctrine announced in United States v. Spearin, 248 U. S. 136, 39 S. Ct. 61, 63 L. Ed. 169, regarding a contract for the construction of a drydock, viz.:
 

 “Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered. * * But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. Mac-Knight Flintic Stone Co. v. New York, 160 N. Y. 72, 54 N. E. 661; Filbert v. Philadelphia, 181 Pa. 530, 37 A. 545; Bentley v. State, 73 Wis. 416, 41 N. W. 338. See Sundstrom v. State, 213 N. Y. 68, 106 N. E. 924. This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work, as is shown by Christie v. United States, 237 U. S. 234, 59 L. Ed. 933, 35 Sup. Ct. Rep. 565, Hollerbach v. United States, 233 U. S. 165, 58 L. Ed. 898, 34 Sup. Ct. Rep. 553, and United States v. Utah, N. & C. Stage Co., 199 U. S. 414, 424, 50 L. Ed. 252, 255, 26 Sup. Ct. Rep. 69, where it was held that the contractor should be relieved if be was misled by erroneous statements in the specifications.”
 

 In the case of Penn Bridge Co. v. City of New Orleans, 222 F. 737,138 C. C. A. 191, the Circuit Court of Appeals for this circuit, citing two Louisiana decisions and the provisions in the Civil Code, held:
 

 “A contractor, who agreed to construct a bridge in accordance with the plans and specifications furnished by the other party, from which the contractor was not permitted to deviate, can recover for material and labor furnished thereunder, where the bridge collapsed just prior to its completion because of a defect in the plans and specifications.”
 

 We do not find that there was any defect in the plans or specifications in this case, except that the ships that were built accordingly did not pass muster. But the controlling principle in the case is the same that governed in the cases which we have cited; for the builder built according to the plans and specifications, as he was obliged to do; and that the result was not what the plans and specifications were supposed to lead to was not the builder’s fault.
 

 The judgment is affirmed.