41 So.2d 819

## BRASHER v. CITY OF ALEXANDRIA.

No. 38846.

Feb. 14, 1949.

On Rehearing May 31, 1949.

Rehearing Denied June 30, 1949.

Frank H. Peterman, City Attorney, C. F. Gravel, Jr., Alexandria, for defendant-appellant.

J. B. Nachman, Isaac Wahlder, Alexandria, for plaintiff-appellee.

McCALEB, Justice.

Brasher brought this suit to recover the sum of $16,659.43, representing the balance allegedly due for work done under a contract to construct a sewer system for the city of Alexandria. The facts upon which the claim is predicated are as follows:

On July 29, 1942, the parties entered into a written contract obligating Brasher to furnish "all material and labor and construction complete of an extension of the

municipal sanitary sewer system of the city of Alexandria, Louisiana, War Public Works Project Docket No. La. 16–116" for the sum of $161,641.23. Due to the fact that the project was sponsored by the Federal Works Agency, the agreement was of great length, comprising more than sixty pages, and contained provisions relative to the employment of labor which are not commonly found in ordinary construction contracts. The agreement also included other usual provisions, relative to time of completion and the obligations assumed by the contractor, coupled with the main obligation " * * * to furnish all the materials, supplies, machinery, equipment, tools, superintendents, labor, insurance, and other accessories and services necessary to complete the said construction in accordance with the conditions and prices stated in the proposal attached hereto, and in accordance with all the General and Special Conditions of the Contract, and in accordance with the plans, which include all maps, plats, blue prints, and other drawings and printed or written explanatory matter thereof, and specifications and contract documents therefor as prepared by I. W. Sylvester, herein entitled the (Engineer), together with Contractor's written proposal, the general and special conditions of the contract, the contract documents, construction regulations, and the Performance Bond, · * * *."

After the confection of the agreement, Brasher endeavored to perform the work under the supervision of the engineer of the city of Alexandria and various city inspectors. During the progress of the job, alterations in the original agreement were made which were necessitated by various conditions encountered by the contractor which were not foreseen by the parties at the time the contract was made. In all, there were 17 "change orders" executed in writing, aggregating a cost of $90,000, which increased the contract price to the sum of $216,239.

During the course of construction between stations 0 † 00 and station 39, the contractor was confronted with a serious soil condition necessitating, in his opinion, the use of extra materials as a cradle to stabilize the pipes to be laid in the trench. Inasmuch as the plans and specifications did not provide for the cradling of the sewer pipes, the contractor requested the Acting City Engineer [1] for a change order so that stabilization of the pipes could ·be had, recommending that concrete cradles be employed. The Engineer and the Commissioner of Streets and Parks took the position that the furnishing of concrete cradles, or, for that matter, any other material for stabilization of the sewer pipes, was an obligation of the contractor and that the city would not be responsible therefor. In view of the attitude of the city's officers, the con-

---

[1] Mr. Sylvester, the City Engineer named in the contract, died during the progress of the work.

tractor laid the pipes in the trench as provided for in the specifications, using wooden boards as a stabilizer. These boards were not an adequate brace for the load sustained by the pipes and, as a result, some 78 pipes on this particular section of the sewer line collapsed. The city thereafter employed another contractor to make the proper repairs between stations 0 † 00 and station 39 at a cost of $13,588.45 and, when Brasher presented his estimate, it deducted that sum from its final payment on the ground that he had failed to fully comply with his agreement.

It further appears that, after the sewer extension had been laid between station 39 † 35 and station 41 † 05 on Wise Street, it failed because of similar soil conditions and resultant lack of stabilization of pipes in the trench to that occurring in the section of the work above mentioned, that is, between stations 0 † 00 and station 39. Upon discovery, the contractor applied to the Acting City Engineer for a written order to correct the condition but the latter refused on the ground that it was the contractor's obligation to stabilize the pipe. Despite the refusal of the City Engineer, the contractor made the necessary repairs at the insistence of the government engineer, who urged him to do so in order that a Negro housing project, which had been erected by the federal government, could be connected to the sewer line. In fact, the evidence shows that the government engineer assured plaintiff that he would see that he

was paid under the "force work" provision of the contract. However, the city has never paid the amount of this extra work which is shown to be the sum of $3060.98.

Thus, plaintiff's claim is comprised of two items, $13,588.45, which he contends was wrongfully deducted by the city from the balance due on the contract, and $3060.-98, for the extra work in repairing the Wise Street sewer extension. The basis of the cause of action in each instance is that the extra cradling work required for the stabilization of the sewer pipes was due to defective plans and specifications prepared by the City Engineer and that, this being so, he is entitled to recover as he has fully complied with his obligation. ·

The city, on the other hand, contends in the main that the repairs to the sewer system were necessitated by the contractor's failure to perform in accordance with the conditions of the contract which required him to examine the site and acquaint himself with the general conditions under which the work was to be done and, thus, made it his obligation to overcome any difficulties encountered resulting from soil conditions or otherwise to the end that he deliver a complete sewer system free from defects.

After a protracted trial in the lower court in which a mass of evidence was adduced, there was judgment in plaintiff's favor, as prayed for. The city prosecuted this appeal.

In this court, the city reurges the contention that it is not responsible because the repairs rendered necessary as a result of the soft soil rested upon plaintiff and not upon it.[2] It also complains about certain conclusions of fact of the trial judge which we find unnecessary to discuss as the record leaves no doubt that the defects in the sewer system were due to soil conditions which made it imperative that the sewer pipes be stabilized by concrete cradling. Hence, the narrow question for decision is whether the obligation rested on plaintiff or upon the city to provide the cradling.

The City Attorney relies upon the general rule that a contractor will not be excused from his obligation by reason of unforeseen difficulties encountered in the work. In support of his argument, he directs attention to various general provisions of the contract, making it the duty of the contractor to examine the site where the work is to be performed, check the plans and specifications, etc., and the cases of O'Leary v. Board of Port Com'rs for Port of New Orleans, 150 La. 649, 91 So. 139; Picard Const. Co. v. Board of Com'rs, 161 La. 1002, 109 So. 816 and Terrill Const. Co. v. Town of Pineville, 168 La. 894, 123 So. 611, are cited as controlling.

The principle depended upon by the city is sustained by the above cited cases, to which may be added Jung v. Gwin, 174 La. 111, 139 So. 774, but it is wholly without application to a matter like this, where the work is performed in conformity with plans and specifications prepared by the owner and the damage results from the insufficiency of those plans and specifications. In such instances, the loss must be borne by the owner according to the jurisprudence which is now well settled in practically every American jurisdiction. See annotation in 88 A.L.R. pages 797 through 805 and cases discussed therein including Hebert v. Weil, 115 La. 424, 39 So. 389; Louisiana Shipbuilding Co. v. Bing Dampskibsaktieselskab, 158 La. 548, 104 So. 364 and Young v. Barelli, 169 La. 319, 125 So. 258.

The leading case on this subject is United States v. Spearin, 1918, 248 U.S. 132, 39 S.Ct. 59, 61, 63 L.Ed. 166, where suit was brought by the contractor for a balance due for work done under a contract to construct a dry dock and also damages for its annulment. The cause of action was founded upon the theory that the plans and specifications provided by the government for relocation of a six foot sewer

---

[2] The city filed exceptions of vagueness and no cause of action to plaintiff's petition. The exceptions were overruled below and they are stressed again here in the briefs of the city. We do not regard the exceptions as meritorious. Therefore, it suffices to say that an examination of the petition satisfies us that it is quite specific and that it fully sets forth a cause of action, ex contractu.

were insufficient and defective and that, as a result, the work could not be performed. In upholding the validity of the contractor's contention, the court, through Mr. Justice Brandeis, declared:

"The general rules of law applicable to these facts are well settled. Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered. Day v. United States, 245 U.S. 159, 38 S.Ct. 57, 62 L.Ed. 219; Phoenix Bridge Co. v. United States, 211 U.S. 188, 29 S.Ct. 81, 53 L.Ed. 141. Thus one who undertakes to erect a structure upon a particular site assumes ordinarily the risk of subsidence of the soil. Simpson v. United States, 172 U.S. 372, 19 S.Ct. 212, 43 L.Ed. 482; Dermott v. Jones (Ingle v. Jones) 2 Wall. 1, 17 L.Ed. 762. But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. MacKnight Flintic Stone Co. v. New York, 160 N.Y. 72, 54 N.E. 661; Filbert v. Philadelphia, 181 Pa. 530, 37 A. 545; Bentley v. State, 73 Wis. 416, 41 N.W. 338. See Sundstrom v. State, 213 N.Y. 68, 106 N.E. 924. This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work, as is shown by Christie v. United States, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933; Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898; and United States v. Utah, N. & C. Stage Co., 199 U.S. 414, 424, 26 S.Ct. 69, 50 L.Ed. 251, [252, 255], where it was held that the contractor should be relieved, if he was misled by erroneous statements in the specifications.

"In the case at bar, the sewer, as well as the other structures, was to be built in accordance with the plans and specifications furnished by the government. The construction of the sewer constituted as much an integral part of the contract as did the construction of any part of the dry dock proper. It was as necessary as any other work in the preparation for the foundation. It involved no separate contract and no separate consideration. The contention of the government that the present case is to be distinguished from the Bentley Case, supra, [73 Wis. 416, 41 N.W. 338], and other similar cases on the ground that the contract with reference to the sewer is purely collateral, is clearly without merit. The risk of the existing system proving adequate might have rested upon Spearin, if the contract for the dry dock had not contained the provision for relocation of the 6-foot sewer. But the insertion of the articles prescribing the character, dimensions and location of the sewer imported a warranty that if the specifications were complied with, the sewer would be adequate. *This implied warranty is not overcome by*

*the general clauses requiring the contractor to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance. The obligation to examine the site did not impose upon him the duty of making a diligent inquiry into the history of the locality with a view to determining, at his peril, whether the sewer specifically prescribed by the government would prove adequate.* The duty to check plans did not impose the obligation to pass upon their adequacy to accomplish the purpose in view. And the provision concerning contractor's responsibility cannot be construed as abridging rights arising under specific provisions of the contract." (Italics ours.)

The doctrine of the Spearin case was specifically approved by this court in Louisiana Shipbuilding Co. v. Bing Dampskibsaktieselskab, supra, and fully controls the result in the case at bar. The plans and specifications, prepared by the City Engineer, were insufficient and defective in that no provision was made for the cradling of the pipe to be laid by the contractor. The City Engineer should have been aware that soft soil might be encountered in the construction of the sewer line, necessitating the stabilization of the sewer pipes by use of concrete cradling. His failure in this respect renders the city responsible for the extra work as the contractor performed his obligation strictly in accordance with the plans and specifications furnished him.

The City Attorney also maintains that the city should not be held liable for the repair work done by plaintiff in rectifying the defects on Wise Street, amounting to $3060.98, for the additional reason that plaintiff's request for a change order covering this work was refused. Hence, it is argued that, in view of paragraphs 33 and 34 of the contract providing that the city will not be responsible for changes and extras in work "unless the same was done in pursuance of a written order", no liability ensues.

This proposition cannot prevail because the record makes it clear that refusal of the Acting City Engineer to issue a written order to rectify the defect, resulting from the insufficient plans and specifications prepared by the city, was purely arbitrary and unreasonable. Plaintiff complied with the plans and specifications in laying the sewer line on Wise Street. After the line failed due to the soil subsidence, the Federal Works Administration Engineer urged plaintiff to repair the .work so that the Negro housing project (in which the government was interested) could be connected, stating that he would see that plaintiff was paid under the force work provision of the contract. Plaintiff acceded to the request of the U. S. Engineer, despite the fact that the Acting City Engineer had arbitrarily refused to issue a change order so that the necessary work could be done. It is to be noted that neither the Acting City Engineer nor the Commissioner of Streets protested against plaintiff making the repairs to the sewer line. On the contrary, they were well aware that he was

doing the work and the Chief City Inspector was furnished with itemized vouchers at the end of each day showing the labor and material costs for the day's work. Indeed, they merely took the position that the extra work was an expense to be borne by plaintiff.

The facts herein are strikingly parallel to those in United States v. L. P. & J. A. Smith, 256 U.S. 11, 41 S.Ct. 413, 414, 65 L.Ed. 808. There, the contractor agreed to excavate a ship channel located in the Detroit River in accordance with certain plans and specifications. The contract provided that final decision relative to the excavating work would rest with the government engineer in charge as to the quality and quantity of work and required the contractor to observe his instructions; that modifications of the work in character and quality were to be agreed upon in writing and that, unless so agreed upon or expressly required in writing, no claim should be made therefor. It appeared that, during the excavation work, Colonel Lydecker, the engineer in charge (having succeeded Colonel Poe), ordered the contractors to work at particular spots on the northerly end of the project where the contractors encountered a mass of limestone bedrock which had to be removed and which was not contained in the plans and specifications. The contractor protested and asked for the fixing of an extra price for doing the work. Colonel Lydecker refused and informed the contractors that, if they did not remove the

bedrock, they would be declared in default. They acceded, and later sued in the Court of Claims to recover the extra cost attendant thereto, amounting to $119,304.27. The government defended on the ground that the contract provided that the decision of the engineer in charge as to quality and quantity of the work was final; that his instructions were required to be observed and that the government would not be liable for any modification of the work in character and quality unless agreed to in writing. In rejecting this defense, the Supreme Court of the United States declared:

"The contention overlooks the view of the contract entertained by Colonel Lydecker and the uselessness of soliciting or expecting any change by him. His conduct, to use counsel's description, 'though perhaps without malice or bad faith in the tortious sense,' was repellant of appeal or of any alternative but submission with its consequences. And we think, against the explicit declaration of the contract of the material to be excavated and its price. The contract provided, in response to advertisements and in fulfillment of bids, for the excavation of a ship channel 20 and 21 feet deep and that 'the material to be removed consists of clay, sand, gravel, and boulders, all in unknown proportions.' To these explicit provisions, and their contractual force we may add the judgment and conduct of Colonel Poe, the first engineer officer in charge of the work. He realized immediately when a bed of limestone rock was en-

countered it was not the material stated in the contract and without hesitation entered into another contract concerning it, and at a price of significant contrast—18 cents per cubic yard, scow measure, being the price of the first contract, $2.24 per cubic yard of excavation, bank measure, being the price of the second contract.

"We think the case is within the principle of Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 533, 58 L.Ed. 898; Christie v. United States, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933; United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166, and United States v. Atlantic Dredging Co., 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735."

The evidence in the case at bar exhibits that the parties realized that the plans and specifications drawn by the City Engineer were inadequate and, during the progress of the work, many changes were made as the contractor was confronted with various conditions not contemplated or provided for in the specifications. Accordingly, the refusal of the Acting City Engineer to issue the change order for the repairs required on Wise Street, was purely arbitrary as he was well aware that the repairs would have to be made in order for the system to operate. The contractor had complied with the specifications, as there was no provision contained therein for stabilization of the pipes by cradling. If he had not made the repairs, the city would have been required to have the work performed by another contractor. In other words, the claim for this work falls squarely in the same category with the repairs between stations 0 † 00 and station 39. The only difference is that the contractor himself performed the work in this instance. If he had not done so, the city would have been required to employ another contractor to remedy the defect as it did on the repair work between stations 0 † 00 and station 39.

Another complaint of the city is that the judge erred in awarding plaintiff judgment for interest and costs. It is contended that interest and costs may not be assessed against the state or any of its political subdivisions in the absence of specific enactment.

The point is well taken. Act No. 135 of 1936 provides that "neither the State, nor any parish, municipality, or other political subdivision, * * * shall be required to pay court costs in any judicial proceeding * * *" instituted or prosecuted by or against them except stenographic costs for taking testimony. This statute has been construed to mean that not only are political subdivisions exempt from payment of their own costs but that they are likewise not amenable for costs expended by litigants successfully prosecuting claims against them, except in expropriation proceedings. See Westwego Canal and Terminal Co. v. Louisiana Highway Commission, 200 La. 990, 9 So.2d 389; Harrison v. Louisiana Highway Commission, 202 La. 345, 11 So.2d 612; Makofsky v.

Dept. of Highways, 205 La. 1029, 18 So. 2d 605 and Hamberlin v. Tangipahoa Parish School Board, 210 La. 483, 27 So.2d 307. Nor is the State and its political subdivisions liable for interest under the well-established jurisprudence. See Boxwell v. Dept. of Highways, 203 La. 760, 14 So.2d 627; Makofsky v. Dept. of Highways, supra, and Hamberlin v. Tangipahoa Parish School Board, supra, on rehearing, see 210 La. 501, 27 So.2d 312.

The city has filed a plea of prescription of one year in this court and asserts, in a supplemental brief, that plaintiff's action is barred because it is founded in tort.

The argument is without substance. This suit is grounded exclusively on the contract and consists of a claim for a balance due and extra work thereunder. It is, therefore, governed by the prescription of ten years under Article 3544 of the Civil Code and does not come within the class of actions prescribed by one year under Articles 3534 and 3536, relating to torts and other matters. See P. Olivier & Sons v. Board of Com'rs, 181 La. 802, 160 So. 419; Bandel v. Sabine Lbr. Co., 194 La. 31, 193 So. 359 and Levin's Auction Exchange v. Samuels, La.App., 28 So.2d 340. The cases cited by the city in support of the plea of prescription are inapposite.

The judgment appealed from is amended by disallowing recovery of interest and costs, except stenographic costs, and in all other respects it is affirmed.

MOISE, J., dissents and will assign written reasons.

O'NEILL, C. J., and HAWTHORNE, J., take no part.

MOISE, Justice (dissenting).

This is an action for damages to recover the cost of replacement of 78 joints for a faulty installation of a sewerage system located in the city of Alexandria. The meat of the coconut for a determination of responsibility is the proximate cause for the damaged installation.

The city contends that the failure of the installation was due to subsidence or faulty soil conditions. The contractor argues that the proximate cause of the collapse was due to defective plans and specifications. The city, before issue was joined, filed an exception of vagueness to compel the contractor to specify with particularity in what respects the plans and specifications were defective. The district court overruled this exception. The record shows that the contractor installed 1,500 joints, that 1,422 were installations made according to specifications and that the remaining 78 joints that collapsed were installed in the location where there was the defective soil condition. This showing is conclusive because the physical facts prove that the collapse was due to the defective soil condition and not to any defects in the plans and specifications.

In the majority opinion it is stated that the City Engineer should have specified "a cradle" to be placed where the defective soil condition was found. This is a refinement adding to the obligation of the law of contract. The Engineer can do only those things that were visible. The soil was good for 1422 joints. His specifications were proper. He has no X-ray eyes to see into the bowels of the earth. Under the contract, the contractor was obligated to furnish the materials and the labor to do the work and it was the contractor's obligation to see that the soil was of sufficient strength to support the weight of the sewerage pipes. Our own court speaks with authority. The contractor is not entitled to recover additional compensation because of defects that are encountered by him in the performance of the job. Picard v. Levee Board, 161 La. 1002, 109 So. 816; O'Leary v. Board of Commissioners, 150 La. 649, 91 So. 139; Terrell Constr. Co. v. Town of Pineville, 168 La. 894, 123 So. 611.

The majority opinion of this court herein pitches its findings on the case of United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 61, 63 L.Ed. 166. The holding in that case fits this case like a glove modeled for a beautiful woman. The court was careful in stating the general rules of law and then the exception to that general rule. So held the court: "Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, be-

cause unforeseen difficulties are encountered." Day v. United States, 245 U.S. 159, 38 S.Ct. 57, 62 L.Ed. 219, Phoenix Bridge Co. v. United States, 211 U.S. 188, 29 S.Ct. 81, 53 L.Ed. 141. The contract here was possible of performance because the contract was performed by Boh Construction Company and it is the cost of a suitable installation that is the subject of this litigation. With plastic adaptation, the United States Supreme Court continues with language fitting the instant case: "Thus one who undertakes to erect a structure upon a particular site, assumes ordinarily the risk of subsidence of the soil." Simpson v. United States, 172 U.S. 372, 19 S.Ct. 222, 43 L.Ed. 482, Dermott v. Jones (Ingle v. Jones), 2 Wall. 1, 17 L.Ed. 762. Under this general law the contractor is liable. We have no exception of a contract beyond the control of the contractor. The opinion seeks to make the city liable on an exception to the general law. In the quoted United States Supreme Court opinion, the exception to the general law reads as follows: "But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." MacKnight Flintic Stone Co. v. New York, 160 N.Y. 72, 54 N.E. 661; Filbert v. Philadelphia, 181 Pa. 530, 37 A. 545; Bentley v. State, 73 Wis. 416, 41 N.W. 338. See Sundstrom v. State, 213 N.Y. 68, 106 N.E. 924. The United States Supreme Court

points out and it was shown that the defects in that case were in the specifications—the engineer had provided for a pipe too small and it broke because of intensive water pressure—this was a matter over which the contractor had no control and faulty specifications (inadequate pipes) were the proximate cause of the damaged installation. That case falls within the exception to the general law but in the instant case we have no such condition as faulty specifications or faulty pipes. What would be the consequence were the rule of law announced by the majority opinion applied to drilling contracts for oil, gas, and water? If under such contracts the engineer were required to provide in his specifications for the hazards of a stone strata underground when the contract was for boring at so much per foot. The rule would restrict the exploration for oil, gas, etc., because it would make the owner the insurer of all hazards of the undertakings by the contractor and would penalize the owner in making his improvements. A rule that enriches a contractor at the expense of a public improvement for the city is inequitable.

## On Rehearing.

### HAWTHORNE, Justice.

In our original opinion, we concluded that, since the plans and specifications prepared by the city engineer were insufficient and defective in that no provision was made for stabilizing the sewer pipe laid by the contractor when unstable conditions in the soil would be encountered preventing the laying of the pipe to grade, the city was liable, and the contractor was entitled to recover, since he performed his obligation strictly in accordance with such plans and specifications, and that under these circumstances the case was controlled by the doctrine announced in United States v. Spearin, 1918, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166. Furthermore, with reference to the Wise Street job, we again applied the doctrine of the Spearin case, and in addition concluded that the refusal of the acting city engineer to issue a written order for the extra work was purely arbitrary and unreasonable, and that under these circumstances the contractor could recover for this work notwithstanding the fact that no written order was issued as required by the contract.

As pointed out in the original opinion, Brasher, the contractor, bound himself to furnish "all material and labor and construction complete of an extension of the municipal sanitary sewer system of the City of Alexandria" under certain terms and conditions as quoted and set forth in the original opinion. The specifications under the title "Final Acceptance" provided that the contractor before tendering the work for final acceptance should go over and clean up the entire line of work, restore all streets, etc., and that "He shall flush and clean all sewer lines, *correct any*

*deficiencies existing in the sewers, manholes or other appurtenances, and put the entire system in working condition.* This having been done, and upon notification from the Contractor that it is ready for final inspection, the Engineer will examine and test the work, and if he shall find it to be properly constructed, and in accordance with the plans, specifications, and contract, he will so report to the Mayor and Council, and the work may then be finally accepted." (All italics ours.)

In the instant case, there have never been a completion and a final acceptance of the work as contemplated by the contract. The contractor did not correct the deficiencies in the sewer or put the entire system in working order. It is true, that the acting city engineer in a letter to the contractor passed the work, but, before final acceptance by the city as contemplated by the contract, the defective condition of the sewer line was discovered, and thereafter the city, so that a settlement might be made with the Federal Works Agency, which was furnishing a portion of the funds for the work, adopted a resolution of conditional acceptance, authorizing the mayor to sign a notice of conditional acceptance of the work. This notice contained the following language: "The above acceptance is without prejudice to any of the rights of the City of Alexandria to recover damages against the said Contractor for failure to comply with the terms of his contract or to maintain any claim against him for defective materials

or workmanship or for any other items for which he is responsible under the terms of the contract, the City hereby reserving all rights against him and his bondsmen for violation of or failure to comply with the terms of said contract in any respect or any amendments, alterations or additions legally made thereto."

As pointed out, prior to this conditional acceptance, the deficiencies in the sewer system had been discovered, but had not been corrected as required by the contract.

During the course of construction the contractor, Brasher, concluded that it was impossible to proceed with the work due to a soil condition which he had encountered which made it impossible to lay the pipe to grade as required in the specifications, as follows: "Special care must be taken to lay the pipe to the exact line and grade." Upon encountering this condition, the contractor requested of the city proper instructions as to how to stabilize the trench so that the pipe might be laid to grade. The city took the position that this was his responsibility and refused to issue a written order specifying the type of cradling necessary to lay the pipe to grade, because such authorization would have bound it for the expense of the cradling as extra work. He then proceeded, without written authorization from the city, to lay the sewer pipe, using boards to stabilize or bring the pipe to grade because it was impossible to lay the pipe to grade without some kind of stabilization.

There is evidence that the contractor's foreman was informed by a city inspector that it was not proper to bring the pipe to grade by the use of boards, but the foreman informed the inspector that the bringing of the pipe to grade was their worry, and that "We will put what we want to under there". Brasher denies this, contending that no objection was made by the city to the use of boards. However, we do not think the record supports his contention.

The record discloses that the contractor, Mr. Brasher, had been doing sewer and similar construction work for a period of 46 years, and that he assisted in the construction of the first sewer in Alexandria, and, at the time he undertook the present contract, was engaged in the construction of a sewer system for an army comp near Alexandria. There is no doubt whatsoever that he is an expert in such construction work. He himself testified that, in his opinion as such an expert, the proper method to use in bringing the pipe to grade where unstable soil conditions existed was to cradle it in concrete, preferably, or, as a second choice, in clam shells, or, as a third alternative, in wash gravel, and that good engineering practice would not sanction the use of boards for this purpose. Notwithstanding this opinion, he used boards to stabilize the trenches.

On February 15, 1944, during the course of construction, the contractor wrote a letter to the City of Alexandria in which he had this to say with reference to soil conditions:

"The specifications covering this construction state that 'The excavation at the bottom is to be made in shape, or as nearly as practicable, to fit the lower half of the pipe to be laid, with holes cut out at the joints for the sockets to rest in so that the pipe shall have a uniform bearing on the ground from end to end.' Soil conditions in the trench bottom have been encountered which will not permit compliance with this section of the specifications and unless a pipe bed of some type is placed, the full strength of the pipe will not be developed. *The pipe will not hold its grade and alignment after backfilling and in addition, failure may occur from improper bedding.*

"Request is hereby made that necessary change order be issued for placing a cradle under the pipe until trench bottom conditions improve to a point where the cradle is unnecessary. The decision concerning the type of cradle to be used rests with your engineering department, and the additional cost for placing it cannot be agreed upon until its specifications are known.

"Unless you instruct me to place the cradle, or otherwise improve the bedding, at an additional cost, I, hereby, disclaim responsibility for the alignment, grade, or failure of the sewer when constructed under the existing trench bottom conditions."

There is no doubt that the contractor realized that it was his obligation under the contract to lay the pipe to grade, and, further, there is no dispute that the proper or best method to do this under the existing soil conditions was to use a concrete cradle, or, to say the least, a cradle of clam shells or of sand and gravel, and that good engineering practice would not sanction the use of boards. The contractor himself recognized that, by improper bedding, the very thing might happen that did happen, that is, a failure in the sewer line itself. His refusal to place a proper cradle under the pipe was caused solely by the fact that he did not want to bear the extra expense thereof.

Under these circumstances, was he relieved of his obligation under the contract to correct the deficiencies and put the sewer in working order, when the sewer line failed or became defective prior to final acceptance by the city? We think not.

In our original opinion we recognized the general rule of law to be that, where one agrees to do for a fixed sum a thing possible to be performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered. O'Leary v. Board of Port Com'rs for Port of New Orleans, 150 La. 649, 91 So. 139; Picard Const. Co. v. Board of Com'rs of Caddo Levee Dist., 161 La. 1002, 109 So. 816; Jung et al. v. Gwin, 174 La. 111, 139 So. 774. See also

6 Williston on Contracts, Rev.Ed., sec. 1964, p. 5512. The contractor is also liable if the building or work is destroyed before completion. This liability is expressed in our Code as follows: "When the undertaker furnishes the materials for the work, if the work be destroyed, in whatever manner it may happen, previous to its being delivered to the owner, the loss shall be sustained by the undertaker, unless the proprietor be in default for not receiving it, though duly notified to do so." C.C. Art. 2758.

The contractor, Brasher, recognizes these general principles of law, but contends that they do not apply when a contractor performs in accordance with plans and specifications furnished by the owner. He takes the position that he constructed the sewer line strictly according to the plans and specifications furnished by the owner, the city, and that due to the inadequacy and insufficiency of these plans and specifications the sewer failed, and that he is not responsible for such failure in the sewer system and is therefore entitled to recover the full contract price, together with an additional amount to cover extra work in connection with the Wise Street job.

The contention of the contractor would be well founded if his defective performance was caused by inadequate or insufficient plans and specifications, the sufficiency of which had been expressly or impliedly warranted by the owner which furnished them.

The general rule is that, if destruction of a work during the course of construction is caused by defective, inadequate, or insufficient plans and specifications furnished by the owner, the contractor is nevertheless liable. Dermott v. Jones, 2 Wal. 1, 17 L.Ed. 762; Stees et al. v. Leonard et al., 20 Minn. 494; Magnan & Co. v. Fuller et al., 222 Mass. 530, 111 N.E. 399; Lonergan et al. v. San Antonio Loan & Trust Co., 101 Tex. 63, 104 S.W. 1061, 106 S.W. 876, 22 L.R.A., N.S., 364, 130 Am.St. Rep. 803; Board of Education of City of Millville v. Empire State Surety Co. of New York et al., 83 N.J.L. 293, 85 A. 223. An exception to this rule is recognized where the owner expressly or impliedly warrants the sufficiency of the plans furnished by him. United States v. Spearin, supra; Passaic Valley Sewerage Com'rs v. Tierney, 3 Cir., 1 F.2d 304; Kinnear, Inc., v. City of Lincoln Park et al., 260 Mich. 250, 244 N.W. 463.

In Lonergan v. San Antonio Loan & Trust Co., supra, the problem of liability for defects in plans and specifications furnished by the owner was explored fully. In that case the contractor contended that the destruction of the building was caused by defects in the specifications furnished by the owner, and that the owner expressly guaranteed the sufficiency of the specifications, and that, if the guaranty was not express, the terms of the contract were such that the law should imply a guaranty in favor of the contractor. What the court said in regard to those contentions is pertinent here [101 Tex. 63, 104 S.W. 1066]:

"* * * We have not been able to find, from a careful examination of the contract and specifications, any terms used therein from which we think there could by any fair construction arise by implication a guaranty of the sufficiency of the specifications, and no such clause has been pointed out. *The plaintiffs in error* [the contractor and the surety] *claim that this can be derived from the fact that the architect is to have supervision and control of all the work and other circumstances of that character; but these are provisions simply for the protection of the owner, who was represented in the execution of the work by the architect, while the builder represented himself.* We are of the opinion that Thos. Lonergan & Co., *having failed to comply with their agreement to construct and complete the building in accordance with the contract and the specifications, must be held responsible for the loss, notwithstanding the fact that the house fell by reason of its weakness arising out of the defects in the specifications and without any fault on the part of the builder.* Dermott v. Jones, 2 Wall. 1, 8, 69 U.S. 1, 17 L.Ed. 762; School Dist. No. 1 v. Dauchy, 25 Conn. [530], 535, 68 Am.Dec. 371; Superintendent etc. of Public Schools of City of Trenton v. Bennett, 27 N.J.L. 513, 72 Am.Dec. 373; Clark v. Pope, 70 Ill. [128], 133.

"Counsel for plaintiffs in error have cited many cases in which the courts have said that the builder or contractor does not guarantee the sufficiency of the specifications. *It is a correct proposition, because the specifications are, as a matter of law, not guaranteed by either party to the other.* In the cases cited, we believe that without exception the contractor had performed his work according to the terms of his agreement and had fulfilled his contract by finishing the structure, terminating his relation as contractor, after which the house was destroyed by some accident or calamity, or had fallen from some defect or weakness in the structure or fault of the soil, and in such cases the courts have held that the contractor does not guarantee the sufficiency of the specifications, but only the skill with which he performs his work and the soundness of the material used therein. He is therefore not liable for the destruction of the building after he has performed his agreement by completing the structure. Clerk v. Pope, 70 Ill. [128], 132. It has been just as uniformly held, however, that whenever the building or structure has been destroyed by reason of any defect in the work done, or by any accident or any means whatever before the contract has been completed, then the contractor must bear the loss, no matter what might be the occasion thereof, unless it be some wrong done by the owner subsequent to the making of the contract which caused the fall. Liability of the builder does not rest upon a guaranty of the specifications, but upon his failure to perform his contract to complete and deliver the structure."

In Magnan & Co. v. Fuller et al., supra, where the contractor was bound to build according to plans and specifications furnished by the owner, the court found no circumstances in the record which would constitute an implied guaranty of the plans by the owner. The court said there:

"* * * When one enters into a contract with a builder to erect a structure in accordance with plans and specifications, which are open to inspection, without express provision touching the subject, there is no implied warranty or agreement on the part of the owner in the absence of circumstances which by necessary intendment are the equivalent of a warranty or agreement, that the work can be done according to the plans and specifications, or that, if so done, it will be safe. It is the duty of one, who proposes to enter into a building contract to examine the contract, plans and specifications, and to determine whether it is possible to do the work before entering into the engagement, or to insist upon some stipulation covering that matter. If, without a special agreement upon that point, he makes a general contract without fraud or mutual mistake, he has bound himself to do the work. If it turns out that he has agreed to do something which is impossible or impracticable, he cannot for that

reason alone refuse to go forward. Having made his contract, he must fulfill it or bear the consequences of a breach. * * *

"The contract in the case at bar is simple, direct and unequivocal. It contains no stipulation on the part of the committee that the grand stand could be completed or that it would be safe when completed. There are no circumstances revealed in the record which constitute an implied guaranty to this effect. The undertaking of the contractor is unqualified that he will complete the grand stand 'in accordance with the plans and specifications.' The evidence offered and excluded constituted no excuse for failure to perform the contract."

Williston, a well recognized authority on contracts, states and discusses this rule and its exception as follows:

"Even though the plans upon which a contractor undertakes to construct a building are so defective as to cause the building to fall while in course of erection, he is not generally relieved from liability.

"*The propriety of these decisions depends upon the question whether the owner can be regarded as warranting the sufficiency of the plans.* If the owner through his architect or engineer can be regarded as having superior expert knowledge, and on the basis of such knowledge to represent to the builder the feasibility of carrying out the plans, the owner must be held responsible for the consequences of any defects in them. In ordinary cases, perhaps,

the builder may be supposed to have sufficient knowledge of what is feasible to make unfounded the assumption of justifiable reliance by him on the superior knowledge of another; but where the work in question involves technical engineering skill, and the plans are made by expert professional men engaged by the owner, there seems good reason for implying a warranty.

"Though the builder may be liable if he fails, by reason of defective plans furnished him, to complete work which he has undertaken, yet if he can and does complete it according to the plans he is not liable for subsequent inferiority, injury, or destruction of the work, due to the defective character of the plans." 6 Williston on Contracts, Rev.Ed., sec. 1966, pp. 5515-5518. See also Berick, Warranties in Building Contracts, 6 U.Cin.L.Rev. 121; Note 21, Minn.L.Rev. 70.

In the instant case, it is true that the city did have the benefit of expert engineering advice both in the preparation of the plans and specifications and in the supervision of the work, but at the same time Brasher, the contractor, was an expert himself in the construction of sewer lines, and was assisted therein by superintendents and foremen who were expert and professional men with many years' experience. It therefore cannot be said that the city had superior expert knowledge at its disposal. The plans themselves did not purport to be extensive and minutely detailed as to the method of laying the pipe to grade, and

thus did not purport to cover every contingency. In the plans and specifications, the city made no representation, expressly or otherwise, that soil conditions would not be encountered which would present difficulties in laying the pipe to grade, nor was there contained therein any representation that any particular type of construction would take care of difficulties encountered in the soil. It is not contended that the owner had any actual knowledge of the faulty condition of the soil which it withheld from the contractor. On the other hand, the contractor was required to examine the site and to inform himself fully of the conditions relating to the construction and labor under which the work was to be performed, and in his proposal, accepted by the city, he stated that he had examined the site.

In soliciting bids for the construction of the sewer line, the city of Alexandria in Section 7 of its "Information for Bidders", styled "Examination of Site", stipulated that all bidders were required to inform themselves fully of the conditions relating to the construction and labor under which the work would be or was then being performed, and in the proposed schedule signed by plaintiff, the contractor, and submitted to the city, which was accepted, the contractor stipulated: "The undersigned hereby declares that he has visited the site and has carefully examined the Contract Documents relating to the work covered by the above bid or bids." Notwithstanding that all bidders for this job were required

to examine the site, and that Brasher, as the successful bidder, declared that he had visited the site, Mr. Harold Miles, acting engineer for the city, testified without contradiction that he asked Mr. Bowdon, manager for plaintiff, whether he was going to make borings along the sewer line to determine what kinds of soil would be encountered so that proper preparations could be made, and that Mr. Bowdon stated that no such borings had been made, and that the soil conditions would be ascertained as the trench was dug.

The record discloses that, when unstable soil conditions were encountered, all parties realized and knew that cradling was necessary to stabilize the pipe for the completion of the sewer, and the contractor knew the best manner of stabilizing the trench bottom and the proper method of preparing the cradling for this purpose. Therefore, the difficulty encountered did not involve any work requiring technical engineering skill not possessed by the contractor.

■■ In the instant case, although the city furnished the plans and specifications, it did not in any manner expressly warrant the sufficiency thereof, nor do we find, after a consideration of all the facts and circumstances, any implied warranty as to their sufficiency. Even the fact that the work was done under the supervision of the owner does not, of itself, imply a warranty. See Lonergan et al. v. San Antonio Loan & Trust Co., supra. See also Berick, Warranties in Building Contracts, loc. cit

supra, p. 132. In the absence of any such warranty, express or implied, the contractor was obligated under his contract to construct the sewer line complete, to correct any deficiencies therein, and to put the entire system in working order prior to final acceptance by the city. The city therefore properly deducted the item of $13,588.45, the cost of repairing the sewer, from the balance due on the contract, and properly refused to pay the item of $3060.98 for the work in repairing the Wise Street sewer extension.

Our original opinion in this case was based principally upon the doctrine announced in the cases of United States v. Spearin, supra, and Louisiana Shipbuilding Co. v. Bing Dampskibsaktieselskab, 158 La. 548, 104 So. 364. A further study of these cases has convinced us that the doctrine announced therein has no application in the instant case, and is not controlling here.

For instance, in the Spearin case the contractor agreed to build a dry dock according to plans and specifications which had been prepared by the government. The site of this dry dock was intersected by a six-foot brick sewer, and it was necessary to divert and relocate a section thereof before the work of constructing the dry dock could begin. The plans and specifications provided that the contractor should do the work, and prescribed the *dimensions, material, and location* of the section to be substituted. Both before and after diver-

sion of the six-foot sewer, it was connected with a seven-foot sewer. All of the prescribed requirements were fully complied with by the contractor. About a year after its relocation, the six-foot sewer broke in several places as a result of internal pressure, and the excavation of the dry dock under construction was flooded. There was a dam, from five to five and one-half feet high, in the seven-foot sewer with which the relocated sewer was connected. During a heavy rainfall and high tide, the presence of this dam forced the water up the six-foot sewer as thus constructed, and caused it to break, as hereinabove set forth. The dam which obstructed the seven-foot sewer was not shown either on the city's plans of the sewer system or on the United States government's plans and blue prints which were submitted to the contractor, but, on the contrary, on the government's plans the seven-foot sewer appeared as unobstructed. Under these circumstances, the Supreme Court of the United States in holding the government liable found that *there was an implied warranty* to the effect that, if the specifications were complied with, the sewer as thus relocated would prove adequate. In that case the plans and specifications prescribed the dimensions, material, and location of the six-foot sewer, *which proved inadequate.* In the course of the opinion the court said:

"But the insertion of the articles prescribing the character, dimensions and location of the sewer *imported a warranty*

that if the specifications were complied with, the *sewer would be adequate.* \* \* \* The obligation to examine the site did not impose upon him [the contractor] the duty of making a diligent inquiry into the history of the locality with a view to determining, at his peril, whether the sewer specifically prescribed by the government *would prove adequate.*"

In the Spearin case, there was an implied warranty, which we do not find in the instant case, that, if the sewer were constructed pursuant to the plans and specifications prepared by the government, it would prove adequate, and these plans and specifications prescribed and set forth with exactness the character, dimensions, and location of the sewer to be relocated.

Under the facts and circumstances of the Spearin case, the court very properly found that there was an implied warranty of the plans, but in the course of the opinion pointed out that "The risk of the existing system proving adequate might have rested upon Spearin [the contractor], if the contract for the dry dock had not contained the provision for relocation of the six-foot sewer."

In the Louisiana Shipbuilding Co. case, supra, the builder agreed to build certain ships according to plans and specifications furnished by a steamship company. The contract, immediately after the stipulation that the ships would be built to such plans and specifications, contained a provision that the vessels should be constructed according to the requirements of American record to class A No. 1 for ocean-going vessels. The ships were built according to the plans and specifications, but did not class A No. 1 for ocean-going vessels according to the requirements of the American Bureau of Shipping, and the question was whether the builder or the steamship company was responsible for the failure. In holding the liability to be on the steamship company, this court said in the course of its opinion in that case [158 La. 548, 104 So. 365]: "Both parties to the contract believed that the ships, when completed, would be approved by the American Bureau of Shipping, to class A No. 1 for ocean-going vessels, if built according to the plans and specifications that had been approved by the bureau's chief inspector, and especially when built under the direct observation and inspection of the bureau's local inspector. The builder had no right to deviate from the plans or specifications that had been furnished by the steamship company or to deviate from the working plans or instructions that were given by the steamship company's draftsman as the work progressed. The double requirement in the contract that the ships should be built to the plans and specifications annexed to the contract, and that they should 'be constructed according to the requirements of American record to class A No. 1 for ocean-going vessels', *did not make the builder a warrantor that the ships, when completed, would be classed A No. 1 by the American Bureau of Shipping.* It would

have been so perhaps if the builder had furnished the plans and specifications, representing them as for a ship to class A No. 1 for ocean-going vessels. * * *"

That case is authority solely for the proposition that the builder was not a warrantor that the ships when completed would be classed A No. 1 by the American Bureau of Shipping, since they were to be constructed according to detailed plans and specifications furnished by the steamship company, from which the builder had no right to deviate, and, further, the court specifically found that there was not any defect in the plans and specifications except that the ships which were built accordingly did not pass muster. In that case the court was not concerned with the liability as between the owner and the contractor when a work collapses before completion because of defects in the plans and specifications, but had before it the question of whether the contractor had bound himself to produce a certain result in addition to his obligation to build according to plans and specifications. The question was answered by considering whether there was a builder's warranty, and not whether there was a warranty by the owner. In that case there was no warranty by the builder, either express or implied, that the ships constructed according to the plans and specifications would be classed A No. 1 for ocean-going vessels, and the court held that it was not liable for the failure of the ships to pass as such.

215 La.—30

In brief on rehearing, Brasher contends that the instant suit is based upon a completed contract, and that, as the defect in the sewer system was caused by the soil condition, under the law of this state the responsibility is on the city of Alexandria. In support of this contention he cites Article 2762 of our Civil Code and the following decisions of this court: Fremont et al. v. Harris et al., 9 Rob. 23; Powell v. Markham, 18 La.Ann. 581; Police Jury of Parish of Vernon v. Johnson, 111 La. 279, 35 So. 550; and A. M. Blodgett Const. Co. v. Cheney Lumber Co., Ltd., 129 La. 1057, 57 So. 369. Article 2762 reads as follows: "If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, *on account of the badness of the workmanship,* the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks."

The corresponding article of the Code Napoleon is Article 1792, which (as translated in Louisiana Legal Archives, Volume 3, Part 2, Compiled Edition of the Civil Codes of Louisiana, under Article 2762) reads as follows: "If a building which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, *on account of the badness of the workmanship, or even because of badness of the soil,* the architect and un-

dertaker shall bear the loss, if the building falls to ruin in the course of ten years."

It thus appears that the drafters of our Code saw fit, under Article 2762, to limit the liability of the architect or undertaker to defective workmanship, as the provision found in the Napoleonic Code extending the liability to "baaness of the soil" was omitted therefrom.

To determine the proper meaning and construction to be placed on Article 2762 of the Civil Code, it is necessary that we read and consider in connection therewith Article 2758, which provides:

"When the undertaker furnishes the materials for the work, if the work be destroyed, in whatever manner it may happen, *previous to its being delivered to the owner,* the loss shall be sustained by the undertaker, unless the proprietor be in default for not receiving it, though duly notified to do so."

A consideration of these two articles shows conclusively that Article 2762 applies, and can only apply, where the building or other structure has been completed and delivered to the owner, and in such case the liability of the undertaker is restricted to a loss resulting from defective workmanship and does not extend to a loss caused by soil conditions. See Comment, 7 La.L.Rev. 564, 569.

In the instant case, as we have previously stated, there had never been a completion and a formal acceptance of the work or delivery to the owner as contemplated by the contract. Article 2762 is therefore without application.

A reading of the cases of Fremont et al. v. Harris et al., Powell v. Markham, Police Jury of Parish of Vernon v. Johnson, and A. M. Blodgett Const. Co. v. Cheney Lumber Co., Ltd., all cited supra, discloses from the facts as stated therein or by express statements in the opinions that in each of these cases the work undertaken by the undertaker had been completed and the building or other structure had been delivered and accepted by the owner. Under this fact, these cases are not applicable to the case here under consideration.

Brasher also cites and relies on two cases decided by the Federal courts, these being Penn Bridge Co. v. City of New Orleans et al., 5 Cir., 222 F. 737, and Alonzo B. Hayden, Inc., v. Town of Covington, D.C., 27 F.2d 354.

In the Penn Bridge Co. case, supra, the bridge company contracted with the City of New Orleans to build for it a bridge strictly in accordance with plans and specifications furnished to the city by bridge architects employed by the city. When the bridge company, pursuant to the terms of the contract and under the supervision of the city engineers, had proceeded with the work to a point near completion thereof, but prior to delivery and acceptance, the bridge collapsed and fell while it was being lowered from a vertical to a horizontal position upon the request and order of the

official of the city who was supervising the work on behalf of the city. The Circuit Court of Appeals concluded that the lower court was in error in a ruling that had the effect of denying to the bridge company the right to recover for work done under this contract, and for this reason remanded the case for a new trial. The court found that the collapse of the bridge was not due to any fault or omission on the part of the bridge company or to any defective material used therein or to any non-observance by it of the terms of the contract, but was due altogether to the fact that the plans and specifications which the contract required the builder to observe strictly were fundamentally defective and insufficient. The opinion does not disclose, nor can we ascertain from a reading thereof, in what manner these plans were defective and insufficient, nor does the opinion point out what was the immediate cause of the collapse of the bridge. In the course of its opinion the court said [222 F. 742]:

" * * * We understand it to be well settled that by the making of such a contract as the one involved in this case the owner impliedly warrants the sufficiency for the purpose in view of the plans and specifications which the contractor is required to follow, and subjects himself to liability to the contractor for loss or damage entailed upon the latter in consequence of a fatal deficiency or fault in the plans or specifications not discoverable by him by the exercise of ordinary diligence upon inspection. * * *"

If it was the meaning of the court by the above quoted statement to hold that the city warranted the sufficiency of the plans and specifications, that case has no application here, for, as we have stated hereinabove, in the instant case we have found that there was no warranty as to the sufficiency of the plans and specifications, either express or implied. Further, the cited case does not disclose what considerations compelled the court to conclude that there was an express or an implied warranty of the sufficiency of the plans and specifications, unless it regarded the mere act of the owner in furnishing such plans and specifications as a warranty by the city as to their sufficiency. If this is the correct interpretation of that case, we do not choose to follow it, as the effect of the decision is to relieve the contractor from all liability in all cases of ascertaining for himself the feasibility of performing under the plans and specifications furnished by the owner, and, if such defective or insufficient plans prevent the accomplishment of the object and purpose of the contract prior to delivery and final acceptance, the contractor is not liable therefor. If we are in error that the basis of this opinion was that the court found a warranty by the owner as to the sufficiency of the plans and specifications, and if the correct interpretation of the ruling therein is to the effect that the contractor was free from fault, and that the bridge collapsed because of defective plans and specifications, this decision is contrary to the general rule that, if defec-

tive performance is caused by defective **or** insufficient plans and specifications furnished by the owner, the contractor is nevertheless liable. See Stees et al. v. Leonard et al., Magnam & Co. v. Fuller et al., Lonergan et al. v. San Antonio Loan & Trust Co., all cited supra. See also 6 Williston on Contracts, supra, sec. 1966, note 1, p. 5516.

In the Alonzo B. Hayden, Inc., case, supra, it was expressly provided in the contract that the engineers of the town would decide when a foundation was necessary in the trenches for the sewer, that they would designate the material for the foundation, and that the contractor would be paid extra therefor. The provision in this respect is quoted in the opinion as follows [27 F.2d 354]: " 'Where the bottom of the trench does not, in the opinion of the engineers, make a suitable foundation for the sewer, the trench shall be deepened and a new foundation of such material as the engineers may require shall be put in as directed by them. The contractor shall receive for this extra foundation the price bid per 1,000 feet B. M. if foundation is of lumber, on the price bid per cubic yard for concrete masonry if the foundation is concrete, and for additional excavation as is made necessary by reason of such foundation; he shall also receive the price per cubic yard for such additional excavations as is estimated by the engineers.' "

In that case, the owner by contract provision expressly undertook the liability for any unstable conditions of the trench. For this reason that case is not in point, and the holding therein is not applicable here.

In further support of his contention that the city was liable for conditions of the soil, the contractor relies on the well recognized rule that, when there is doubt as to the meaning of the contract, the practical construction of it by the parties should be given great weight in determining the meaning. The cases cited by counsel are authority for this rule, but the facts are not pertinent to this case. Brasher argues that, since the city issued 17 change orders for extra work during the course of construction, this showed that the intention of the parties was that the city should supply any needed engineering omitted from the contract. Of course, the contract itself contained an ordinary and usual provision that the owner could order extra work, or alter, add to, or deduct from the work without invalidating the contract. Actually, neither party intended anything either way regarding liability for the soil condition encountered, because neither contemplated or anticipated such a situation at the time of the making of the contract; therefore, the primary problem in this case is not to interpret the meaning of a contract, but to determine where the law places liability when plans and specifications furnished by the owner are inadequate and insufficient. If we apply the rule urged by Brasher, however, it is doubtful from the record that the city's action showed that it considered that it was liable for the soil

conditions encountered by the contractor which necessitated stabilization of the trenches. Certainly, a fair appraisal of the city's action in taking advantage of the provision permitting the issuance of change orders and orders for extra work would not result in the conclusion that it thus considered that it was liable for every difficulty requiring engineering work that would be encountered in the course of the construction.

The contractor's contention would be strengthened in this case if the record disclosed that the city authorized cradling in the change orders to take care of the unstable soil conditions encountered in the trenches. The acting city engineer, Mr. Miles, testified that he never issued an order for concrete cradling to take care of the soil condition. His testimony is verified by that of the contractor himself, who testified that from the beginning of this construction project, when the trouble was first called to the city's attention, it took the position that it was not liable for the condition found in the soil. The record as a whole confirms the fact that the city was consistent in this position. There is no basis, therefore, for finding that the city construed the contract to mean that the liability was on it for the condition of the soil.

For the reasons assigned, the judgment appealed from is reversed, and it is ordered that plaintiff's claim be rejected and his suit dismissed at his costs.

The right to apply for a second rehearing is expressly reserved.

McCALEB, J., concurs with written reasons.

O'NIELL, C. J., does not take part.

McCALEB, Justice (concurring).

Further study of this case in the light of the facts, as set forth and analyzed in the opinion on rehearing, has convinced me that the original opinion is erroneous in the conclusion that the plans and specifications furnished by the city were defective and insufficient because no provision was made for the stabilization of the sewer pipes in the event soft soil would be encountered in the execution of the work. I am now persuaded that, since the contractor was obliged to lay the pipes to grade, he was required, in the performance of that duty, to provide bracing for the pipes, if it became necessary as the result of soft soil or other conditions. The deficiency was not in the specifications but in the site. Accordingly, the doctrine of Simpson v. United States, 172 U.S. 372, 19 S.Ct. 212, 43 L.Ed. 482, and Dermott v. Jones (Ingle v. Jones) 2 Wall. 1, 17 L.Ed. 762, rather than United States v. Spearin (1918) 248 U.S. 132, 39 S.Ct. 59, 63.L.Ed. 166, controls.

The Articles of the Civil Code relative to the respective rights and liabilities of the undertaker and owner in building jobs, Articles 2756 through 2777, are not, in my

opinion, applicable to the case at bar, as the parties have made their bargain by written contract which is the law between them.

I concur in the decree.