JOAN BERNARD ARMSTRONG, Chief Judge.
11Defendant, The Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (LSU), appeals from a judgment of the trial court awarding its contractor, Harbor Construction Company, Inc. (Harbor), direct expenses of $17,225.07 and overhead expenses of $33,828.90 sustained as a result of a work stoppage ordered by LSU. For the reasons that follow, we affirm the judgment of the trial court.
Following a bench trial on the merits, the trial court found the following facts:
Following a competitive bid process, LSU chose Harbor to replace acid basin tanks located at the LSU Clinical Sciences Research Building in New Orleans. On July 22, 2004, LSU instructed Harbor to stop work on the project, when Harbor severed a sewer pipe located six feet below the work site. Harbor was allowed to resume work on November 11, 2004. The sewer pipe is not shown on the site plan LSU provided to Harbor, nor is it referenced in LSU’s plans or specifications for the contract. The trial court found as a fact that neither the contract nor any change order placed a burden on Harbor to discover the existence [ aof underground pipes. It held as a matter of law that Harbor had no duty to check the plans and specification furnished to it by LSU to determine if they were accurate and sufficient before proceeding with the execution of the contract. Furthermore, Harbor was entitled to rely on the accuracy and sufficiency of the plans and its only obligation was to perform in accordance with those plans. The trial court concluded that Har *500 bor proved its damages by a preponderance of the evidence adduced at the trial.
In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings. Where documents or objective evidence so contradict a witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a fact finder’s finding is based on its |adecision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
If trial court legal errors have tainted the fact finding process, the verdict below is not reviewed under the manifest error standard and, if the record is complete, the appellate court may make a de novo review of the record and determine the preponderance of the evidence. Rosell v. ESCO, 549 So.2d 840, 844 fn. 2 (La.1989); Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163 (1975).
It is our duty to review LSU’s legal arguments de novo, and to apply the manifest error standard to its claims of factual error. LSU argues that the trial court’s judgment was legally erroneous because the plaintiff had a contractual duty to discover underground utilities not shown on the construction drawings. LSU contends that this contractual duty also precludes application of La. R.S. 9:2771[1] to relieve it of that alleged contractual duty. LSU also claims that the trial court erroneously found that Harbor performed its work in accordance with the contract, erroneously did not find that the delays and damages were caused by Harbor’s breach of the contract, and erroneously awarded damages that were not probed by a preponderance of the evidence. These latter claims will be reviewed under the manifest error standard of review.
|4The trial court received testimony from Thomas Foret, Harbor’s project manager in 2003 and 2004; Joseph Skinner, Harbor’s owner and president; Robert S. Parker, Jr., LSU’s director of purchasing[2]; and Michael James May, LSU’s construction coordinator.
The contract form entered into by LSU and Harbor on August 28, 2003 incorpo *501 rates by reference “the Drawings, Specifications, Addenda Number(s) 2, Information for Bidders and General Conditions, Proposal Form, Specific Conditions and Advertisement for Bids”. Mr. Foret testified that he had been in the construction business since 1975, moving up from a position in the construction crew to foreman, general foreman, and ultimately to project manager. He assisted Mr. Skinner in the preparation of Harbor’s bid for the LSU project, reviewing the bid documents, including plans and specifications, prepared by Wink, Inc., LSU’s engineering firm. Mr. Foret testified without contradiction that Harbor took no part in the preparation of those bid documents, plans or specifications.
Mr. Skinner testified that the purpose of the site plans prepared by LSU was to show the things that should be taken into consideration by the contractor when bidding the job. He stated that an owner does not expect a bidding contractor to show up for an inspection of the jobsite with a shovel and a backhoe. He identified the plans and specifications for the LSU job, and testified without contradiction that the sewer pipe shown on the plan was the only sewer line shown and was not |fithe sewer line that was severed. Mr. Skinner also testified that the owner should designate any underground obstructions on the site plan. According to Mr. Skinner’s testimony, had the bid package required Harbor to locate all existing sewer and electrical lines, he would not have bid on the project.
Mr. Foret described the LSU project as removal of existing acid-waste tanks, construction of a new concrete vault, and installation of new acid-waste tanks and double-insulated piping to and from the tanks. The hole to be dug would be twelve feet with a sub-base.
In preparing Harbor’s bid, Mr. Foret and Mr. Skinner made a visual inspection of the job site, at which Mr. Skinner told the general superintendent to ask where the building’s footings were located, since they might be in the way of the construction. As a civil engineer, Mr. Skinner knew the building would have to have footings. Mr. Skinner, Mr. Foret, and the superintendent probed to see if there were footings and located them. Mr. Foret noted that building footings constituted an obstruction to the project, reducing the available work area.
Mr. Skinner testified that there was not adequate space between Perdido Street and the sidewalk and the building’s footings to perform the work. This required a reconfiguration of the work, according to Mr. Skinner, from placement of two 1250 gallon tanks to one 2,000 gallon tank. This reconfiguration was performed with a Wink, Inc. engineer. Mr. Foret testified that he requested a soil report during the “bid walk”, but, receiving none, went forward in the preparation and submission of the bid. Mr. Skinner confirmed that Harbor never received a | (¡geotechnical report on the project. He testified that had LSU obtained this sort of report, it would have shown very soft soil at the location of the severed sewer pipe.
On January 2, 2004, Mr. May issued a request for proposal for changes in the Contract Sum and Contract Time for proposed modifications described as:
1. Provide removal of liquid from existing acid sumps.
2. Provide excavation as required to locate the animal waste piping from the building exit to the animal waste sump, and to determine the usage and location of the sewer cleanout near the animal waste sump.
3. Provide backfill over excavated piping, with detectable warning tape 24 *502 inches below grade, and temporary identification of piping location at grade during construction....
In response, on January 9, 2004, Mr. Foret submitted a proposal to remove existing liquids and perform the excavation, including backfilling with warning tape, for a total of $11,640.00, proposing: (1) to pump down liquids in tanks to existing limestone rocks; (2) existing electric ground light may require complete removal; (3) backfill sloped to approximately two inches below top of existing tanks to allow an unobstructed view of the existing tanks and to prevent foreign material from entering the tanks; (4) to provide temporary wood cover to cover the tanks during excavation and backfilling; (5) the work will require an extension of time, the duration of which will be determined once the revised scope of work is known; and (6) the price is based on straight time uninterrupted work.
Mr. Foret re-worked the proposal and submitted Change Order # 1, dated January 23, 2004. This change order proposed removal of existing liquids, costing $3,418.00, and excavation, costing $5,345.00. The proposal states the following 17work would be performed pursuant to Change Order # 1: (1) existing liquids in tanks will be pumped down to existing limestone rocks; (2) existing electric ground light may require complete removal; (3) as per LSU’s instructions, in order to make the work less expensive, no back-fill is included; (4) provide a temporary wood cover to cover the tanks during excavation and backfilling; (5) an extension of time will be required, the duration of which will be determined once the revised scope of work is known; and (6) the price is based on straight time uninterrupted work. According to Mr. Foret’s testimony, as confirmed by Mr. Skinner’s testimony, this change order was to locate an animal waste line and sewer clean-out, which features were located and are not relevant to the sewer line that later was severed.
On cross-examination, defense counsel suggested that this additional excavation was also to determine other hidden conditions. Mr. Foret responded that the intention was to locate a known animal waste line and sewer clean-out, and that there was no reason to believe there were obstructions or utilities on the sidewalk side of the excavation. He also noted that if the term “excavation” were to include excavation to locate the severed sewer line that was six feet below the surface, such excavation would have required construction of a cofferdam.
The defense referred Mr. Foret to an LSU internal memorandum dated January 27, 2004, written by Gary Desimone of LSU’s purchasing department, indicating that Change Order # 1 in the amount of $8,763.00 was for removal of existing liquids in the existing acid basin tanks and for “excavation to reveal [shidden conditions and determine location of animal waste line.” Mr. Foret testified to no prior knowledge of that memorandum. We note that LSU’s January 2, 2004 request for proposal and Harbor’s proposed and final change orders do not mention “hidden conditions,” and Mr. Foret specifically denied that the object of the change order’s excavation was to do anything more than to locate the animal waste line and sewer clean-out, features unrelated to the severed sewer line. This testimony appears to have been accepted by the trial court, and is reasonable. We note that the only mention of “hidden conditions” is contained in an LSU internal memorandum that, by its own terms, does not appear to have been circulated prior to commencement of this litigation.
*503 Prior to excavation of the pit, Harbor installed a temporary bypass system, and drove sheet metal to form a cofferdam to allow for the excavation and prevent surrounding dirt from sliding into the pit. The sheet piling was twenty feet deep and the excavation was between ten and twelve feet. During the construction of the sheet piling cofferdam, Harbor severed a sewer pipe.
Mr. Foret identified the Wink, Inc. site plans incorporated in the contract, adding by a drawing in red the pipe that was severed. It is clear from the site plan that the plan did not show the pipe that ultimately was severed. Mr. Foret testified that the severed pipe lay buried about six feet beneath the surface. There was no visible indication of any sewer pipe in the area, and the plan showed, in other locations on the site, existing six inch sewer piping, animal waste sumps, acid waste drain piping, and underground animal waste drain piping. Mr. Foret |9testified that had the sewer line been shown on the site plan, Harbor’s bid would have been substantially different, and Harbor might not have bid on the project. The site plan and Mr. Foret’s testimony clearly support the trial court’s conclusion that the sewer pipe that was severed is not shown on the site plan.
In order to comply with the specifications’ requirement that Harbor supply the necessary equipment to keep the bottom of the pit relatively dry during this work, Harbor provided a well point and pumps to keep the water below the work area. This is standard practice in New Orleans, since the ordinary water table in the city is probably three to four feet below the surface. Mr. Foret testified that these pumps would turn on and off automatically, as needed, and should have taken care of removal of any standing water in the excavation pit.
Mr. Foret testified that the excavation took approximately five hours. When it was completed, he had concern because he noted that the soil was extremely soft, and he did not feel it would hold up the sub-base that was to be installed to support the concrete vault. He called in the LSU representative, who ■ called in the engineer. Subsequently, LSU halted work on the project on July 22, 2004, instructing Harbor to vacate the site. It is clear from the testimony of Mr. Foret and Mr. Skinner that LSU shut down the job not because of the broken sewer pipe but because of the poor condition of the soil at the bottom of the pit.
Mr. May testified to the contrary. Harbor’s representatives denied having received any soil reports prior to the shutdown, and LSU did not offer any soil reports into evidence. In light of the conflicting testimony, it is apparent that the hntrial court accepted Harbor’s position that the severance of the sewer pipe did not cause the soil condition that led to LSU’s decision to stop work and change the bed for the vault. We find the trial court’s decision to accept Harbor’s position to be reasonable and not manifestly erroneous or clearly wrong.
During the cessation of work, Harbor moved out its crane and pumps, and left equipment it had rented in place. Harbor advised LSU, through Mr. May, on August 3, 2004 that because of LSU’s lack of a timely decision on the soil problems experienced at the site, it would remove its crane that day. The remaining rented equipment included sheet piling, a bypass pumping system and the bypass tank. During the cessation of work, Harbor continued to pay rent for this equipment. Harbor also carried over its city permits and parking meter permits, expecting to complete the project when LSU allowed work to continue.
*504 The concrete vault was fabricated by Harbor’s subcontractor, and weighed approximately 67,000 pounds. The original plans and specifications called for it to rest on twelve inches of limestone. Mr. Foret testified that, despite Harbor’s request, LSU did not provide a geotechnical report, soil borings or other evidence of the soil consistency at a depth of ten feet. LSU ultimately decided to put in a pile-supported concrete base for the vault.
Mr. Foret testified, and Mr. Skinner confirmed, that, at the time LSU stopped work on the project, Harbor was ready, willing, and able to complete the project pursuant to the original plans and specifications. The eventual use of a | npile-sup-ported concrete slab was not the project on which Harbor had bid. LSU rejected Harbor’s offer to construct the pile-supported pad as a change order.
Mr. Skinner testified that when LSU shut down the job, it did not ask Harbor to remove its equipment. He understood that LSU expected Harbor to return to the jobsite and finish the project.
Mr. Foret testified on cross-examination that the rented sheet pilings had to remain on the site during construction of the pile-supported pad in order to hold back the surrounding soil while LSU’s contractor drove the piles and installed the concrete pad. The parking meter also was required to remain in place to allow access for the pile driving crane and for the LSU contractor to do his work.
Mr. Foret testified that several months later, LSU allowed Harbor to return to the site, whereupon Harbor completed the job, installing the vault, the tank, the limestone in the tank, and the connecting piping. Everything shown as “to remain” on the site plan remained and was reconnected, if necessary, by Harbor.
It is clear that the statutory non-liability of a contractor for destruction or deterioration of work performed according to the supplied plans and specifications “shall not be subject to waiver by the contractor.” This mandatory language demonstrates the legislative intent to offer a strong protection to a contractor who relies on plans and specifications submitted to him by the owner or its representative. This protection is not absolute, however. In New Orleans Unity Society of Practical Christianity v. Standard Roofing Co., 224 So.2d 60 (La.App. 4th Cir. 1969), this Court held that while an obvious purpose of the statute was to | ¶ ¿relieve a contractor of liability for defects of which he was unaware in materials furnished, but not manufactured by, the contractor, the immunity could be lost should the contractor offer a specific guaranty in connection with the work. The contractor offered a ten-year guaranty of the roof, and this Court held that the statute did not insulate the contractor from liability on his guaranty. Likewise, in third party tort actions, Louisiana courts have held that a contractor may not blindly rely on plans and specifications furnished to the contractor, and could be held liable to third parties if the contractor had reason to believe that compliance with specifications or plans would create a hazardous situation. See, Morgan v. Lafourche Recreation Dist. No. 5, 01-1191 (La.App. 1 Cir. 6/21/02), 822 So.2d 716; Cormier v. Honiron Corp., 00-446 (La.App. 3 Cir. 9/27/00), 771 So.2d 193; Van Alton v. Fisk Elec., Inc., 531 So.2d 1175 (La.App. 4th Cir.1988). Because the statutory immunity is non-waivable and is subject only to exceptions as noted above, we shall examine the contract and change order to determine whether the trial court’s judgment, implicitly finding no guaranty by Harbor, is reasonable.
LSU relies on the following contractual provisions as bases for Harbor’s liability:
*505 Base Bid: Also, the bidder shall visit the site of the proposed work in order to become familiar with the facilities, difficulties, and restrictions involved in attending the execution of the contract. The Contractor shall not be allowed any additional compensation for failure to be so informed. [Emphasis added.]
Intent: 5. All drawing provided by LSU indicating the location and dimensions of spaces and equipment are meant as a guide to the contractor. It is the responsibilities (sic) of the contractor to field verify all 113dimensions and job site conditions that may affect the cost of the project. Verification of job conditions and dimensions prior to bid is the responsibility of the contractor. [Emphasis added.]
Coordination of Work: 6. Verify location of all utilities, i.e. ... water, drains, ... etc. and existing conditions. Notify the Construction Coordinator of conditions that may require any deviation from the specified locations shown on the drawings for the installation of these utilities. [Emphasis added]
Field Engineering: 1. All drawings are for reference only. The contractor is responsible for field verification of all dimensions and job site conditions that may affect the cost of the project. 2. Verify and locate utilities, existing facilities, and equipment. 3. Inspect, examine, and layout improvements, utilities, structures, and components. [Emphasis in original]
Site plan: 5. Contractor shall visit the site prior to bid and shall thoroughly familiarize himself/herself with the existing conditions. By the act of submitting a bid, this contractor accepts the conditions under which he/she will be required to work.... 7. Contractor shall protect existing buildings, structures and utilities from damage. Any damage caused by the contractor shall be repaired at no expense to the owner.
Mr. Foret testified that the sewer pipe, buried some six feet beneath the surface, would not have been apparent upon a field inspection. Mr. Parker testified that LSU expected that the contractor bidding the project would take specific on-site measurements, and do whatever they needed to do to be able to bid the project accurately and include all costs associated with the bid and the project. Mr. May testified that in order to familiarize itself with the job site, Harbor could have used sonar, probe, or digging. He did not indicate which, if any, of these measures would have located the severed sewer pipe. It is not unreasonable to reject LSU’s interpretation of the contract language to require a bidder to excavate the entire jobsite to a level of six feet in order to comply with the contractual inspection requirement.
I14LSU also relies on the contract’s provision requiring Harbor to maintain the existing utilities that are “indicated to remain”. It is reasonable to interpret this clause as imposing an obligation to maintain the utilities that are indicated on the drawings to remain. The severed sewer pipe was not “indicated to remain” on the drawings LSU submitted to Harbor. Similarly, LSU relies on the contract’s demolition section requiring the contractor to protect existing structures “which are to remain”, properly to protect all pipes which “are not noted to be demolished or removed”, and to maintain existing utilities and services “not slated for demolition.” Since the severed sewer pipe is not noted on the drawings, it is reasonable to infer that Harbor was not required to protect or maintain that unmarked pipe pursuant to these contract provisions.
As Justice Brandéis noted, writing for a unanimous court in United States v. *506 Spearin, 248 U.S. 132, 136, 54 Ct.Cl. 187, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918):
[I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work, ... [Citations omitted]
The Spearin opinion was cited by the Louisiana Supreme Court in Louisiana Shipbuilding Co. v. Bing Dampskibsalctieselskab, 158 La. 548, 104 So. 364 (1925), decided decades before adoption of the immunity statute. In the Louisiana case, ships built according to the owner’s plans were not approved by the American Bureau of Shipping. The builder was not at fault since it had followed the owner’s specifications. We find it reasonable to conclude, as did Justice Brandéis nearly a hscentury ago, that the standard contractual language requiring a contractor to visit the site, check plans, and inform themselves of the requirements of the work does not overcome the owner’s responsibility for providing correct plans and specifications.
Neither does Change Order # 1 require reversal of the trial court judgment. The order itself is limited to pumping down the liquids in the existing tanks, possibly removing an existing electric ground light, and providing a temporary wood cover for the tanks during excavation. Mr. Parker testified that he approved the change order with the expectation that Harbor would do exploratory excavations “to reveal anything that was going to be difficult for them to deal with during the execution of the job, as well as to remove the liquids that were there.” On cross-examination, Mr. May admitted that LSU’s excavation request was specific to the animal waste piping and location of the sewer cleanout near the animal waste sump.
Excavation for “hidden” obstructions is mentioned only in LSU’s memorandum of January 27, 2004. Mr. May testified that Harbor’s letter of January 23, 2004 was a change order including removal of existing liquids in the acid sump tanks “as well as excavation of the hidden conditions in the acid, acid lines.” We note, however, that the referenced letter makes no mention of “hidden conditions”. While Mr. Parker claimed that the LSU memorandum of January 27, 2004 was sent to Harbor, he did not identify the person who allegedly sent it, when it was sent and to whom, and provided no objective evidence of such transmittal by facsimile cover sheet, copy shown on the memorandum, or otherwise. It is reasonable to conclude that this was an LSU internal memorandum that was not a part of the final change order. As previously noted, the trial court reasonably could | ifihave accepted Mr. Foret’s testimony that LSU’s request that it provide excavation as required to locate the animal waste piping from the building exit to the animal waste sump, and to determine the usage and location of the sewer cleanout near the animal waste sump referred only to the animal waste piping and sump and the attendant sewer cleanout, and not to the entire underground beneath the job site, or, specifically, to the severed sewer pipe.
We find nothing in the contract that would constitute a guaranty by Harbor similar to that existing in the Standard Roofing case. Nor do we find the trial court’s conclusions from the evidence concerning the nature of Harbor’s contractual undertakings to be unreasonable.
*507 LSU contends that Harbor did not prove its expenses and overhead costs by a preponderance of the evidence.
On August 19, 2004, Harbor advised LSU through Mr. May of its continuing expenses caused by the work stoppage, and noted:
As you are aware, the actual flow rate required for the temporary bypass system far exceeds the engineers [sic] estimate. LSU ... has elected to perform monitoring, emptying and modifications of this system to compensate for the increased flow rates. Please be informed that due to these changes we have concluded that LSU ... assumes full responsibility for this changed condition.
In that same letter, Harbor requested a meeting with “all pertinent parties” to expedite completion of the project. On September 17, 2004, by letter to LSU through Mr. May, Harbor advised LSU of its continuing expenses arising from the 117work delay, and that Harbor would make a claim for its losses. On May 14, 2005, Mr. Skinner sent Wink, Inc. its itemized claim for losses to that point in time[3]:
Crane rental $ 2,233.32
Street sign rental 7/22/04-8/10/04 644.06
City Roadway and Parking Meter fee 1,650.25
Sheet pile rental 7/22/04-11/10/04 1,138.11
Temp, acid tank rental 7/22/04-11/10/04 5,456.32
Builders Risk Policy extension 576.15
Empty overflowing 6500 gal. acid waste tank 2,389.99
Home office overhead 14,018.19
Markup on bond 545.65
Damage caused to cofferdam by LSU plumber 798.62
Home office overhead, Change Order and 2 21,886.10
TOTAL: $51,336.76
In support of its claim, Harbor provided through the testimony of Mr. Skinner evidence of expenses, including:
Copies of invoices from B & G Crane Service (B & G), LLC, for crane rental and Harbor’s cancelled check to that company. Harbor’s check to B & G for $3,411.50 included $577.50 for the first moving in and out of the crane and for rental from July 8, 2004 through August 3, 2004. Harbor did not claim reimbursement for the initial moving charge or for rental from July 8, 2004 through July 22, 2004, for a total, with 15% markup, of $2,233.32.
Copies of invoices from United Rentals Highway Technologies (United), for street signs, and Harbor’s cancelled check to that company. Harbor’s check to United for $980.11 represents payment of rent from July 7, 2004 through August 10, 2004. Harbor claimed reimbursement only for the period from July 22, 2004 through August 10, 2004, with 15% markup, or $644.06.
Copies of applications for city roadway and parking meter fees, and Harbor’s cancelled checks for those permits in the amounts of $420.00, $420.00, $970.00, and $1015.00. Harbor claimed reimbursement for the second roadway *508 fee ($420.00) and second parking hstneter rental for July 10, 2004 through August 8, 2004 ($970.00), for a total, -with 15% markup, of $1,650.25.
Copies of invoices from J.D. Fields and Company, Inc. for sheet pile rental, and Harbor’s cancelled checks to that company in the amounts of $5,802.64, $273.11, $273.11, and $273.11. Harbor claimed reimbursement for rentals from July 22, 2004 through November 12, 2004, less a credit for the last two days in November, for a total, with 15% markup, of $2,345.32
Copies of invoices from Baker Tanks, Inc. for temporary acid tank rental, and Harbor’s cancelled checks to that company in the amounts of $1,589.35, $1,309.35, $1,309.35, $1,333.43, and $1,333.43. Harbor claimed reimbursement for rental from July 22, 2004 through November 11, 2004, less late charges and rental for November 11, 2004, for a total, with 15% markup, of $6,023.01
Copy of Fireman’s Fund invoice for extension of builder’s risk policy, and Harbor’s cancelled check to that company, for a total, with 15% markup, of $576.15.
Copy of invoice from Garner Environmental Services, Inc. for emptying overflowing acid waste tank, supporting documentation, and copy of Harbor’s cancelled check to that company, for a total, with 15% markup, of $2,389.99.
Copy of invoice from J.D. Fields and Company (Fields) to remedy two sheet pilings damaged by Lang Mechanical Contractor, Inc., LSU’s plumbing contractor, and copy of Harbor’s cancelled check to Fields, for a total, with additional bonding cost and 15% markup, of $798.62
Hartford Casualty Insurance Company — New Class B Rate bond charge for a total, including 15% markup, of $545.65
Statement of home office overhead for delays from 7/22/04 to 11/11/04, supporting overhead of $13,207.89.
Statement of home office overhead for change orders 1 and 2 with additional bond cost in the amount of $20,621.01.
119Audits by Pechón & Pechón, L.L.C., Certified Public Accountants, showing Harbor’s general overhead expenses for the years ended 12/31/03 and 12/31/04
The foregoing documentation supports the expenses as revised, claimed by Harbor. We note that our computation of the actual expenses results in a total of $17,206.37, which is $18.70 less than the amount awarded by the trial court. We therefore amend the amount awarded for actual expenses to $17,206.37. We find this award to be supported by the documents offered in connection with Mr. Skinner’s testimony.
In reviewing the award of overhead expenses, we note that Mr. Skinner testified that the overhead charge listed on Harbor’s Exhibit # 16 related to delays caused by Change Orders # 1 and # 2. According to the exhibit, overhead was calculated as $118.99 per day for 170 days. The days were calculated as follows:
“Notice to Proceed to Change Order No. 1 November 10,2003 to January 27,2004 78 days
Change Order No. 1 to Change Order No. 2 January 27, 2004 to April 6, 2004 71 days
Change Order No. 2 to Remobilization *509 April 6,2004 to June 22, 2004 77 days
Minus the time from Notice to Proceed until Mobilization on our original Nov. 17, 2003 Schedule November 10, 2003 to January 5, 2004 (56 days)
Total Delays: 170 days”
The issue of overhead was addressed in Bert K. Robinson, Construction Law: Elements of Contractors’ Damages, 38 La. B.J. 247 (1990):
The contractor is entitled to be reimbursed all of its expenses, direct and indirect, caused by the owner’s breach of contract. One of these expenses is overhead. Overhead may consist of direct expenditures made for job site overhead (also called direct overhead or field overhead), and home office overhead (also referred to as indirect overhead).
| gnWith regard to home office overhead (obviously a very real, but indirect, expense), some courts simply award a figure of 10 percent or 15 percent, whereas other courts prefer an attempt at a more accurate figure. The most generally accepted computation in the United States is found in Eichleay Corp. [Cited in footnote as 60-2 BCA [P] 2688, affd 61-1 BCA [P] 2894 (I960)], which “computes the daily amount of overhead that the contractor would have charged to the contract had there been no delay, and gives the contractor this amount of overhead for each day of delay that has occurred during performance.” [Citing in footnote Nash, Government Contract Changes, 397-398 (1975) ] It is a standard accounting practice to attribute main office expenses to various company projects on some basis.
Job site overhead, being a direct expense, has historically been awarded to the delayed contractor. Louisiana courts, consistent with those of other states, also award the delayed contractor its home office, i.e., indirect, overhead. [Citing in footnote McCarty Corp. v. Industrial Scaffolding, Inc., 413 So.2d 1322 (La.App. 1st Cir.1981); see also, Al Smith’s Plumbing & Heating Service, Inc. v. River Crest, Inc., 365 So.2d 1122 (La.App. 4th Cir.1978) ] [Citations omitted unless specifically noted.]
A contractor is entitled to recover for wasted overhead expenses as an element of damages in connection with his claim for reimbursement of outlay. These overhead expenses are recoverable where, as a result of the defendant’s conduct (in this case, LSU’s failure to assess the condition of the soil underneath the proposed tank and to mark on the plans and specifications the ultimately severed sewer line), the plaintiff may have suffered a work stoppage and may have wasted overhead expenses because labor and equipment were idle during such a stoppage. S.R. Shapiro, 3 A.L.R.3d 689, § 9. The right to recover overhead as an element of damages has also been recognized in Louisiana in Magnolia 21Construction Co., L.L.C. v. Parish of St. Charles, 06-543, p. 5 (La.App. 5 Cir. 11/28/06), 947 So.2d 747, 749.
In the Al Smith’s Plumbing & Heating, Inc. case, this Court found that the evidence provided by River Crest was insufficient to allow the Court to determine if the contractor’s loss was due in part or entirely to the defaulting party’s delay, or it if represented River Crest’s own underbid. The Court awarded a ten percent “customary overhead” award as indirect costs on overruns attributable to Smith’s breach.
*510 In awarding Harbor’s overhead expenses, the trial court cited McCarty Corp. v. Industrial Scaffolding, Inc., 413 So.2d 1322 (La.App. 1st Cir.1981). In that case, the Court noted:
As the record shows overhead or indirect expenses consists [sic] generally of the expenses of a business enterprise for salaries of executives, central office staff personnel, rent, communications, vehicles, utilities, interest on borrowed capital and numerous other expenses which are extremely necessary for the operation of the business, but which are not directly attributable to a particular construction job or project.... Overhead or indirect expenses are in fact an expense. They are as true a cost of doing business as are the direct costs. For these reasons, it is customary to make an award of overhead in both actions of breach of contract and tort actions to cover indirect expenses of the nature testified to in this case ... which are not reflected by a direct expense incurred in remedying the damage sustained, and such expenses need not be proved item by item. Indeed, if we were to require an item by item proof of indirect expenses or overhead, we would be requiring the impossible for most business enterprises, and ruling out recovery of overhead, which is a portion of damages clearly permitted by our laws. Furthermore, if we were to rule out overhead in the present case, we would be interfering with the “much discretion” permitted the trial judge ... in awarding damages by LSA-C.C. art. 1934.
| aaGiven the record taken as a whole, including Mr. Skinner’s testimony and the certification by the certified public accountants, we cannot say that the trial court abused its much discretion in awarding overhead to Harbor in the amount of $33,828.90.
For the foregoing reasons, we amend the award of direct damages to $17,206.37, and affirm the award of overhead expenses.
AMENDED AND, AS AMENDED, AFFIRMED.

. La. R.S. 9:2771 provides:
Non-liability of contractor for destruction or deterioration of work.
No contractor ... shall be liable for destruction, ... in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, ... was due to any fault or insufficiency of the plans or specifications .... The provisions of this Section shall not be subject to waiver by the contractor.

. At the time of the activities relevant to this lawsuit, Mr. Parker served as LSU's assistant director of purchasing.

. On June 15, 2009, the sheet pile rental figure was revised to $2345.32; the acid tank rental figure was revised to $6023.01; the home office overhead was revised to $13,207.89; the markup on bond was revised to $564.35; and the home office overhead caused by change orders 1 and 2 was revised to $20,621.01, resulting in a total claim of $41,053.97.